FILED

May 11 2017, 6:32 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANTS

Robert F. Foos
Neha M. Matta
Neal Bowling
Lewis Wagner, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Timothy S. Schafer
Timothy S. Schafer II
Todd S. Schafer
Schafer & Schafer, LLP
Merrillville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Sandberg Trucking, Inc., and
Kimiel Horn,

*Appellants-Defendants,*

v.

Brittany M. Johnson,

*Appellee-Plaintiff.*

May 11, 2017

Court of Appeals Case No.
79A04-1605-CT-1069

Appeal from the Tippecanoe Circuit
Court

The Honorable Thomas H. Busch,
Judge

Trial Court Cause No.
79C01-1503-CT-14

**Bradford, Judge.**

# Case Summary

Appellants-Defendants Sandberg Trucking, Inc., and Kimiel Horn (collectively, "Appellants") appeal following a jury trial after which they were found thirty percent liable for the injuries of Appellee-Plaintiff Brittany Johnson and ordered to pay $2.13 million in damages. In April of 2008, a tractor-trailer owned by Sandberg and driven by Horn was southbound on I-65 when it struck a deer in the dark, leaving remains in the roadway. Horn stopped his truck approximately 250 feet down the roadway on the shoulder, exited his truck to examine the damage to it, but did not activate the truck's emergency flashers or deploy deflective triangles behind his truck or near the deer remains. Approximately ninety seconds after parking on the shoulder, Horn activated his truck's emergency flashers.

At around this time, a car driven by Johnson's fiancé Joshua Horne approached from the north, and, while apparently attempting to avoid the deer remains, careened out of control into Horn's parked truck, killing Joshua and seriously injuring Johnson. Johnson sued Appellants for negligence, and a jury found Appellants thirty percent liable for Johnson's injures, awarding her $2.13 million. Appellants argue that there is insufficient evidence to sustain the jury's verdict, the trial court allowed the jury to base its verdict upon impermissible speculation, the trial court erred in concluding that Appellants had a duty to warn fellow motorists of a hazard in the road and that a federal regulation pertaining to stopped commercial vehicles applies in this case, and Johnson failed to produce evidence to support the jury award of damages. Johnson

contests all of the above assertions. Because we find Appellants' arguments to be without merit, we affirm.

# Facts and Procedural History

[3] On April 27, 2008, Horn was employed by Sandberg as a truck driver and was southbound in the dark on I-65 in Tippecanoe County at approximately 5:00 a.m. When several deer ran out in front of Horn's tractor-trailer, he unsuccessfully attempted to avoid them, striking one with the left front part of his truck, leaving the deer's remains spread over both lanes of the highway. Horn pulled his truck completely onto the right shoulder, parking approximately 250 feet south of where he struck the deer.

[4] Before activating his truck's emergency flashers, Horn climbed out to assess the damage, which included a headlamp swinging from its connecting wire. After addressing the damaged headlamp, Horn climbed back into the cab, activated the emergency flashers, and began retrieving a box of reflective triangles. Approximately ninety seconds had elapsed since Horn parked the truck. As Horn unlocked the triangle case, he heard the squealing of tires, and, roughly ten seconds later, a car struck the back of his truck.

[5] Meanwhile, Joshua had been approaching the scene driving southbound on I-65 in the right lane with Johnson, his fiancée, in the passenger seat. Presumably to avoid the remains of the deer, Joshua swerved hard to the left and overcorrected to the right, losing control of the vehicle, which slid into the

rear of Horn's truck; Joshua was severely injured and died at the scene. Johnson, then twenty-two years old, sustained severe and, in some cases, permanent injuries, including traumatic brain injury, a ruptured spleen, multiple skull fractures, multiple rib fractures, permanent facial nerve palsy and scarring on her forehead, deafness in her left ear, and memory loss. Additionally, Johnson has trouble learning new things, suffers post-concussive migraines, has gait instability and balance problems, and is at increased risk of developing dementia in the future.

[6]   On July 23, 2009, Johnson filed her complaint against Sandberg and the then-unknown driver of the truck, alleging negligence in failing to activate the truck's emergency flashers or deploy reflective triangles or flares. In response to Appellants' motion for summary judgment, Johnson alleged that Appellants had violated section 392.22 of the Federal Motor Carrier Safety Administration regulations ("Section 392.22"), which provides, in part, as follows:

> (a) Hazard warning signal flashers. Whenever a commercial motor vehicle is stopped upon the traveled portion of a highway or the shoulder of a highway for any cause other than necessary traffic stops, the driver of the stopped commercial motor vehicle shall immediately activate the vehicular hazard warning signal flashers and continue the flashing until the driver places the warning devices required by paragraph (b) of this section. The flashing signals shall be used during the time the warning devices are picked up for storage before movement of the commercial motor vehicle. The flashing lights may be used at other times while a commercial motor vehicle is stopped in addition to, but not in lieu of, the warning devices required by paragraph (b) of this section.

49 C.F.R. § 392.22. Appellants countered that Section 392.22 was inapplicable, as Horn was not engaged in interstate commerce at the time of the accident. The trial court denied Appellants' motion for summary judgment and its request for an order preventing Johnson from placing into evidence the obligations mentioned in Section 392.22.

[7] On February 23, 24, and 26, 2016, jury trial was held on Johnson's negligence claim. James Pinckney, a transportation consultant opined that Horn's failure to follow Section 392.22's requirement to immediately activate his truck's emergency flashers was the cause of the second accident. Following the presentation of Johnson's case, the trial court denied Appellants' motion for directed verdict. On February 26, 2016, the jury returned a verdict in favor of Johnson, finding that she had $7.1 million in damages and that Appellants were thirty percent at fault,[1] for a total money judgment of $2.13 million. On March 28, 2016, Appellants filed a motion to correct error, in which they argued that Johnson failed to establish that any act or omission on Appellants' part was the proximate cause of Johnson's injuries and that the verdict was unsupported by sufficient evidence. On April 27, 2016, the trial court denied Appellants' motion to correct error.

[8] Appellants argue that (1) the trial court erred in concluding that Horn had a duty to warn other motorists not only of his stopped truck but also of the deer

---

[1] The jury found Joshua to have been seventy percent at fault for the accident.

remains, (2) Johnson failed to prove that the alleged negligent actions of Horn were the proximate cause of her injuries, (3) the trial court erroneously allowed the jury to engage in impermissible speculation, (4) the trial court erroneously concluded that Section 392.22 established the correct standard for Horn's behavior in this case, and (5) the jury's damages award in favor of Johnson for $2.13 million was not supported by the evidence presented at trial.

# Discussion and Decision

[9]   "'[T]o prevail on a claim of negligence the plaintiff must show:  (1) duty owed to plaintiff by defendant; (2) breach of duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by defendant's breach of duty.'"  *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 386 (Ind. 2016) (quoting *King v. Ne. Sec., Inc.*, 790 N.E.2d 474, 484 (Ind. 2003)).  "Whether a defendant owes a duty of care to a plaintiff is a question of law for the court to decide."  *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 466 (Ind. 2003).

### *Standards of Review*

[10]   Appellants appeal from the trial court's denial of their motion to correct error.

> In general, we review a trial court's ruling on a motion to correct
> error for an abuse of discretion.  *Hawkins v. Cannon*, 826 N.E.2d
> 658, 661 (Ind. Ct. App. 2005), *trans. denied*.  However, to the
> extent the issues raised by the City are purely questions of law, our
> review is de novo.  *See Ind. BMV v. Charles*, 919 N.E.2d 114, 116
> (Ind. Ct. App. 2009) ("Although rulings on motions to correct

error are usually reviewable under an abuse of discretion standard, we review a case de novo when the issue … is purely a question of law.")[.]

*City of Indpls. v. Hicks*, 932 N.E.2d 227, 230 (Ind. Ct. App. 2010), *trans. denied*.

In the present case, this standard of review is appropriately applied only to the questions of whether Appellants had a duty of care to Johnson and whether Section 392.22 applies in this case, which are questions of law for the court.

[11]    For the remainder of their claims, Appellants are essentially arguing that there was insufficient evidence to sustain the jury's verdict. "The jury, as the trier of fact, must weigh the evidence, draw any reasonable inferences, resolve conflicts in the evidence, determine the credibility of witnesses and decide in whose favor the evidence preponderates." *Ferdinand Furniture Co. v. Anderson*, 399 N.E.2d 799, 805 (Ind. Ct. App. 1980).

> Consequently, our standard of review allows us to overturn a jury's verdict only if there is no evidence on the elements of the plaintiff's claim which will support the verdict. *Farm Bureau Ins. Co. v. Crabtree* (1984), Ind. App., 467 N.E.2d 1220, 1225, *rehearing denied, transfer denied*. On such challenges to the sufficiency of the evidence we view the record in a light most favorable to the verdict, do not reweigh evidence, and will not rejudge the credibility of witnesses.

*Planned Parenthood of Nw. Ind., Inc. v. Vines*, 543 N.E.2d 654, 658 (Ind. Ct. App. 1989), *trans. denied*.

# I. Duty of Care

[12] Appellants contend that the trial court erroneously concluded that Horn had a duty to warn of the entire hazard, including the deer remains on the roadway. Johnson argues that Appellants have framed this issue too narrowly and that the general duty of all motorists to use reasonable care to avoid endangering fellow motorists applies in all traffic cases, including this one.

> Whether a defendant has a duty to conform conduct to a certain standard for the benefit of the plaintiff is generally a question of law. The question of the breach of a duty is usually one for the trier of fact. However, if any reasonable jury would conclude that a specific standard of care was or was not breached, the question of breach becomes a question of law for the court.

*Cox v. Paul*, 828 N.E.2d 907, 911-12 (Ind. 2005) (citations omitted).

[13] In general, "[t]he law requires of every person that he shall exercise due care to avoid injury to others and to protect himself, and the vigilance required is always commensurate with the danger to be apprehended."[2] *Lake Shore & Mich. S. Ry. Co. v. Brown*, 41 Ind. App. 435, 437, 84 N.E. 25, 26 (1908). More particularly, "the duty owed by motorists to fellow motorists is well-established." *Romero v. Brady*, 5 N.E.3d 1166, 1168 (Ind. Ct. App. 2014), *trans. denied*. "All operators of motor vehicles have a general duty to use ordinary

---

[2] The version of this passage found in the *www.westlaw.com* database differs from the official version as found in the Indiana Appellate Court Reports by replacing "he" with "they" and "himself" with "themselves."

care to avoid injuries to other motorists." *Wilkerson v. Harvey*, 814 N.E.2d 686, 693 (Ind. Ct. App. 2004), *trans. denied*.

[14] Appellants argue that the trial court incorrectly interpreted *Shaw v. Stewart's Transfer*, 2010 WL 2943202 (D. Me. 2010), and the Restatement (Second) of Torts § 322 to find that a duty existed in this case. Appellants also go to great lengths to argue that Johnson's own witnesses' testimony supports the proposition that Horn had no duty to warn fellow motorists of the deer remains. We conclude that this is a too-narrow framing of the issue, *i.e.*, arguing whether a general duty to fellow motorists exists given a particular set of unique facts.

[15] As the Indiana Supreme Court has explained in the context of a school's duty to its students,

> An approach that focuses on rearticulating that duty based upon a given set of facts is misplaced in our view because to do so presupposes that an issue which is thought to be settled must be revisited each time a party frames the duty issue a little differently. Rather, because a school's duty to its students already has been established, the focus shifts to whether a given set of facts represents a breach of that duty.

*Mangold ex rel. Mangold v. Ind. Dep't of Nat. Res.*, 756 N.E.2d 970, 974-75 (Ind. 2001) (footnote omitted). Because of the existence of Horn's duty to his fellow motorists (including Joshua and Johnson), the focus shifts to whether a given set of facts constitutes a breach of that duty. *See, e.g.*, *Romero*, 5 N.E.3d at 1169 ("Similarly, it is well-established that motorists have a duty to use due care to avoid collisions, and whether a motorist was following another motorist too closely goes to the issue of breach."). The trial court did not err in concluding

that Appellants had a duty of care to Joshua and Johnson, and the question then becomes whether that duty was breached, to be determined by the jury.

## II. Proximate Cause

[16] Appellants also contend that the jury did not have sufficient evidence on which to find that their actions or omissions proximately caused Johnson's injuries. "The proximate cause of an injury is not merely the direct or close cause, rather it is the negligent act which resulted in an injury which was the act's natural and probable consequence in light of the circumstances and should reasonably have been foreseen and anticipated." *City of Indpls. Hous. Auth. v. Pippin*, 726 N.E.2d 341, 346 (Ind. App. 2000).

[17] It is well established that there may be more than one proximate cause of a plaintiff's injuries. *See, e.g., J.B. Hunt Transp., Inc. v. Guardianship of Zak*, 58 N.E.3d 956, 972-73 (Ind. Ct. App. 2016), *trans. denied*. In this case, the jury found as much by assigning seventy percent of the fault to Joshua. To resolve this case as a matter of law, as Appellants request, this court must find that under no circumstances could any of the fault be properly assigned to Appellants. Put another way, "the issue of proximate cause becomes a question of law where only a single conclusion can be drawn from the facts." *Florio v. Tilley*, 875 N.E.2d 253, 256 (Ind. Ct. App. 2007).

[18] We conclude that this is not one of those cases. Even though a short time elapsed between Horn striking the deer and Joshua and Johnson running into Horn's truck, Horn did have time to do things differently, *i.e.*, immediately

activate his truck's emergency flashers, and the jury could have concluded that the second accident could have been avoided if he had. In other words, Horn had time to take different action, action that the jury was entitled to conclude might have alerted Joshua that there was trouble ahead and/or caused Joshua to slow down. In fact, Johnson's expert James Pinckney opined that Horn's failure to immediately activate his truck's emergency flashers was the cause of the second accident. The jury was entitled to credit Pinckney's testimony, and likely did.

[19] As we have stated,

> Where, as here, the actor's conduct has created a situation which without more is not dangerous to anyone but which may become dangerous if subsequently acted upon by a human being or force of nature, the reasonableness of the actor's conduct must be evaluated, ultimately by weighing the likelihood and potential for harm against the utility of the actor's conduct. Whether the risk involved in doing a particular act is apparent to an ordinarily prudent person is most appropriately left for a jury which can bring to bear its varied experience and common knowledge.

*Harper v. Guarantee Auto Stores*, 533 N.E.2d 1258, 1265 (Ind. Ct. App. 1989) (citations omitted). We conclude that the jury heard sufficient evidence to sustain its finding that Appellants' acts or omissions were a proximate cause of Johnson's injuries.

## III. Impermissible Speculation

[20] In what seems to be essentially a slight variation of the previous two arguments, Appellants contend that the trial court erred in allowing the jury to engage in

what they characterize as impermissible speculation in reaching its verdict. This is little more than a restated claim that the jury's verdict was not sustained by sufficient evidence. The gravamen of this argument is that the jury never heard any evidence from Joshua (who is dead) or Johnson (who sustained head injuries and remembers nothing about the accident) that Joshua would have slowed, shifted to the left lane, or done anything else differently had Horn activated his flashers earlier than he did.

[21] To support this argument, Appellants cite to *Zak*, 58 N.E.3d at 956, a case with somewhat similar facts:

### The First Accident

[3] On January 17, 2006, [Terry] Brown[, Jr.,] was a semi tractor-trailer driver employed by Hunt [Transport. Inc]. He was driving an empty trailer from Greencastle, Indiana, to Bolingbrook, Illinois. At some point, it began snowing. A few miles south of mile marker 205 on I-65 North, Brown felt his trailer move from side to side. He reduced his speed to between fifty and fifty-five miles per hour but did not believe that the weather conditions were bad enough that he had to pull over.

[4] At approximately 6:00 p.m., Brown began driving on the overpass at mile marker 205. He felt a bump in the back, looked in his rear view mirror, and saw the trailer veering to the left side of the interstate. Brown attempted to counter-steer to prevent his trailer from jack-knifing, but his efforts failed. He blacked out briefly, and when he returned to consciousness, he saw that the semi had come to rest in the median between the north and southbound lanes of I-65. The vehicle was in a jackknife position, abutted the guardrail adjacent to the southbound lanes, and was fully contained within the median, approximately 200 to 500 feet

from the overpass. Although Brown never saw any black ice on the roadway, he assumed that it was the cause of the accident.

[5] Brown, who had a noticeable bump on his head, reported the accident to his employer and the police. An ambulance and tow truck were called to the scene. Brown did not turn on the semi's flashers or place reflective warning triangles on the roadway. At 6:05 p.m., Indiana State Police Corporal Terence Weems responded to the accident. Corporal Weems remained at the scene for approximately thirty to forty-five minutes, during which time the ambulance arrived and transported Brown to a nearby hospital.

[6] Corporal Weems did not believe that the location of the semi in the median was a safety hazard to motorists traveling on I-65 North. The surrounding area was dark and unlit, and another officer testified that northbound drivers would likely not even have known that the tractor-trailer was in the median because they would not have been able to see it. The overpass is protected by three-foot concrete barriers on each side, and there is a berm in the median that meets the concrete wall. Together, these barriers would have prevented headlights from northbound vehicles from reflecting off of the semi. Because Corporal Weems believed the scene to be safe to passing motorists, he left before the tow truck arrived to go to the scene of another, unrelated accident.

### The Second Accident

[7] At approximately 7:00 p.m., conditions on I-65 had worsened dramatically. Sleet, heavy snow, and ice became serious problems. Matthew Robinson was driving on I-65 North with his fiancée, Kristen Zak, as the sole passenger. Robinson lost control of his vehicle somewhere on the overpass at mile marker 205. His vehicle slid off of the roadway and spun out of control into the median, eventually striking the side of Brown's jackknifed trailer. Zak, who was thirty-one years old and asleep at the time, received the brunt of the impact and was seriously injured. She sustained serious brain damage, leaving her unable to walk, care for herself,

or care for her six-year-old daughter. Neither Robinson nor Zak have any memory of the accident.

[8] Indiana State Police Officer Martin Benner responded to the scene of the accident. Robinson twice told Officer Benner that he had been driving at the speed limit of seventy miles per hour when he lost control of the vehicle, though Robinson later told an EMT that he had been driving sixty miles per hour. Robinson has no memory of these interactions; indeed, there is a gap in his memory from before the accident to one week after the accident.

*Id.* at 961-62.

[22] Rejecting several challenges by the appellants in that case, we affirmed the jury's verdict in favor of Zak's guardian. *Id*. at 974. Appellants note that in *Zak*, Robinson (the driver) testified that if he had seen the flashers on the truck, he would have slowed down, moved to the right lane, and proceeded with caution. *Id*. at 964. Appellants argue that the absence of such evidence in this case means that any verdict in favor of Johnson was necessarily based on speculation. The presence of certain facts in *Zak* does not mean that a lack of any of those facts in other cases requires a different result. Each case stands alone, and the question is whether the evidence presented in this case—and reasonable inferences arising therefrom—would allow the jury to reach the verdict it did. Here, we conclude that there was sufficient evidence to conclude that Joshua likely would have slowed down or taken other measures had the truck's flashers been on, even in the absence of direct evidence to that effect.

[23] Moreover, we will not adopt a rule that effectively eliminates the possibility of a verdict in favor of the plaintiff(s) in failure-to-warn cases if the relevant person does not testify that he or she would have done anything differently had he or

she been warned of the danger. Put bluntly, it will not be uncommon in such cases for that person to be dead. The jurors should be entitled to infer that things would have played out differently had there been a warning, despite the lack of testimony to that effect.

[24] Appellants also argue that there is no reasonable inference that Joshua would have done anything differently had Section 392.22 been followed because that provision does not address bringing attention to hazards in the roadway, only stationary commercial vehicles. In other words, Appellants argue that the harm in this case was not within the risk that Section 392.22 was designed to avoid, which, they claim, is solely to prevent another motorist from colliding with the stationary truck. This seems to be a variation on Appellants' argument that Johnson failed to prove proximate cause. That said, this is a too-narrow interpretation of Section 392.22. There are any number of reasons why a commercial vehicle might pull off and stop on a shoulder, including striking something in the roadway—something that, as in this case, might still pose a hazard. Arguably, a reasonable person might slow down and exercise caution whenever encountering a stopped commercial vehicle with flashers on, because that person likely has no idea why the vehicle is stopped. Indeed, Horn, Officer Kruger, Officer Cody and Pinckney all testified that the purpose of Section 392.22 was to provide other motorists with warning so that they could slow down, move over, and proceed with caution.

# IV. Section 392.22

Appellants also argue that Section 392.22, as a federal regulation, does not apply in this case because Horn was not engaged in interstate commerce. Even assuming, *arguendo*, that Horn was engaged exclusively in intrastate commerce, Indiana Code section 8-2.1-24-18(a) explicitly provides that "49 CFR Parts 40, 375, 380, 382 through 387, *390 through 393*, and 395 through 398 are incorporated into Indiana law by reference, and … must be complied with by an *interstate and intrastate* motor carrier of persons or property throughout Indiana." (Emphases added).

Appellants argue that this incorporation is too vague to be effective because it does not apply to individual drivers like Horn and other incorporated federal regulations render Section 392.22 inapplicable to intrastate transport. We find these arguments unpersuasive. Appellants note that Indiana Code section 8-2.1-24-18(a)applies, by its own terms, only to "motor carriers" and not individual drivers like Horn. Another one of the regulations incorporated by Indiana Code section 8-2.1-24-18(a), however, provides that "[t]he rules in subchapter B of this chapter are applicable to *all employers, employees, and commercial motor vehicles* that transport property or passengers in interstate commerce." 49 CFR § 390.3(a)(1) (emphasis added). Appellants also note that 49 CFR § 390.3(a)(1) applies to interstate commerce and seem to argue that the General Assembly went to the trouble of adopting federal regulations and specifically making them applicable to intrastate commerce while simultaneously adopting one that nullified the entire adoption. It is, of course,

implausible that this was the General Assembly's intent when it enacted Indiana Code section 8-2.1-24-18. "We must construe statutes to prevent absurdity or a result the legislature, as a reasonable body, could not have intended." *Chavis v. Patton*, 683 N.E.2d 253, 258 (Ind. Ct. App. 1997). Similarly, Appellants note that the General Assembly also incorporated 49 CFR § 383.5, which requires that "commercial motor vehicles" be "used in commerce" and defines "commerce" as

> (1) Any trade, traffic or transportation within the jurisdiction of the United States between a place in a State and a place outside of such State, including a place outside of the United States, and
>
> (2) Trade, traffic, and transportation in the United States that affects any trade, traffic, and transportation described in paragraph (1) of this definition.

As with Appellants' previous argument, we seriously doubt that the General Assembly actually intended to adopt a number of federal regulations and then nullify them in another portion of the same statute. Appellants have failed to establish that Section 392.22 does not apply in this case.

[27] That said, having concluded that Section 392.22 applies to this case, it strikes us as prudent to include some observations regarding the scope and effect of Section 392.22. The parties argue at great length regarding the applicability of Section 392.22, with Johnson asserting that Horn's failure to immediately activate his emergency flashers as required by Section 392.22 automatically leads to liability, and Appellants asserting that Section 392.22 is, essentially, irrelevant, as its purpose is to alert other motorists that the truck is stationary,

not to warn of other road hazards. In our view, both suggested interpretations are too narrow.

[28] Neither party offers any authority for the proposition (and research has recovered none) that Section 392.22 limits, expands, or otherwise defines the general duty of care a motorist owes to fellow motorists in Indiana. Whatever Section 392.22's effect in other contexts, we believe that it is best to view it as a useful guideline in the context of Indiana negligence law. Put another way, following Section 392.22 to the letter should not absolutely shield you from liability any more than failing to follow it should automatically subject you to it. In fact, this court has rejected such a rigid application, explaining that "[u]nder Indiana law, an *unexcused or unjustified* violation of a duty dictated by statute is negligence per se." *Indian Trucking v. Harber*, 752 N.E.2d 168, 172 (Ind. Ct. App. 2001) (emphasis added). In other words, violation of a statutory duty creates a presumption of negligence that may be rebutted.[3]

---

[3] Indeed, it is not difficult to come up with hypotheticals that illustrate why rigid application of Section 392.22 could lead to injustice. Suppose, for example, that Horn had struck a person instead of a deer and that it was a sunny day instead of a dark morning. Under those circumstances, if Horn had attended to the victim first instead of immediately activating his emergency flashers, it seems that requiring rigid adherence 392.22 could lead to injustice. On the other hand, suppose that Horn had hit a difficult-to-see road hazard that disabled his truck. If Horn could have easily and safely removed the hazard from the roadway or alerted other motorists to its presence, relieving him of liability for a subsequent collision because he immediately engaged his emergency flashers—while doing nothing about the hazard—also seems unjust.

# V. Damages Award

Appellants argue that the jury's damages award of $7.1 million is unsupported by evidence in the record.

> A person injured by the negligence of another is entitled to "reasonable compensation," which is the "sum [that] would reasonably compensate the victim both for bodily injuries and for pain and suffering." [*Ritter v. Stanton*, 745 N.E.2d 828, 843 (Ind. Ct. App. 2001), *trans. denied*.] We apply a "strict standard" when we review an appellate claim that a jury's damages award was excessive. *Id.* "A jury's determination of damages is entitled to great deference when challenged on appeal." *Sears Roebuck and Co. v. Manuilov*, 742 N.E.2d 453, 462 (Ind. 2001).
>
>> Damages are particularly a jury determination. Appellate courts will not substitute their idea of a proper damage award for that of the jury. Instead, the court will look only to the evidence and inferences therefrom which support the jury's verdict. We will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground. Thus, if there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting, the award will not be disturbed.
>
> *Id.* (quoting *Prange v. Martin*, 629 N.E.2d 915, 922 (Ind. Ct. App. 1994), *reh'g denied, trans. denied*). When considering a claim of an excessive jury verdict, we [do not] reweigh the evidence, and we "look only to the evidence and the reasonable inferences therefrom which uphold the verdict." *Lutheran Hosp. of Indiana, Inc. v. Blaser*, 634 N.E.2d 864, 873 (Ind. Ct. App. 1994), *reh'g denied*. "To warrant reversal, the award 'must appear to be so outrageous as to impress the Court at "first blush" with its enormity.'" *Ritter*, 745 N.E.2d at 844 (quoting *Kimberlin v. DeLong*, 637 N.E.2d 121, 129 (Ind. 1994) (quoting *New York Cent.*

> *R.R. Co. v. Johnson*, 234 Ind. 457, 127 N.E.2d 603 (1955)), *reh'g denied, cert. denied*).

*Reed v. Bethel*, 2 N.E.3d 98, 113-14 (Ind. Ct. App. 2014).

[30]    Appellants' argument is that the jury's award must be altered or vacated because (1) Johnson did not present any evidence of special, *i.e.*, pecuniary damages at trial and (2) she has been able to maintain employment since the accident and receive raises and promotions.  Appellants point to no authority that evidence of special damages is required in negligence cases, however, and it was for the jury to weigh evidence regarding Johnson's employment history against the other evidence.

[31]    Among the evidence produced by Johnson about the extent of her injuries was testimony from Dr. Jonathan Liss, a neurologist, who testified that she suffered severe traumatic brain injury, "has trouble learning new things[,]" "will forever have inter grade amnesia[,]" and "will have to live with these significant deficient's [sic] the rest of her life."  Tr. p. 332.  Dr. Liss testified that Johnson was close to not surviving the accident; doctors "opened her up from kind of stem to stern" and removed her damaged spleen; she sustained multiple skull and rib fractures; she suffers from permanent facial nerve palsy; and she is deaf in her left ear.  Tr. p. 335.  Dr. Liss added that Johnson suffers from "tremendous" memory loss, tr. p. 350, suffers from post-concussive migraines, and is at increased risk for developing dementia in the future.  Moreover, Johnson lost her fiancé in the accident that permanently injured her.

[32] The trial court instructed the jury, in part and without challenge from Appellants, as follows:

> Brittany Johnson does not have to present evidence of the dollar value of her pain, suffering, and mental anguish, disfigurement, deformity, and permanent injuries. These types of damages need not be proven to a mathematical certainty.
>
> She must prove the nature and extent of these types of damages, however. The dollar value, if any, of these damages is left to your good judgment.

Tr. p. 724.

[33] Considering the extent and permanent nature of Johnson's injuries, the jury's total award of $7.1 million is not so outrageous that it should impress this court with its enormity. Appellants have failed to establish that the jury's damages award cannot be explained on any reasonable ground.

# Conclusion

[34] We conclude that the trial court (1) did not err in finding that Horn had a duty of care to Joshua, Johnson, and his other fellow motorists; (2) did not allow the jury to engage in speculation; and (3) correctly concluded that Section 393.22 applies to intrastate commerce. We further conclude that Johnson produced sufficient evidence to sustain findings that (1) Horn's actions (or inactions) were the proximate cause of her injuries and (2) she sustained $2.13 million in damages.

[35] The judgment of the trial court is affirmed.

Najam, J., and Riley, J., concur.