

FILED

Oct 31 2018, 8:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Scott B. Cockrum
Hinshaw & Culbertson LLP
Schererville, Indiana

ATTORNEY FOR APPELLEE

James Harper
Harper & Harper, LLC
Valparaiso, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brett Carney, *Appellant-Defendant,* <br><br> v. <br><br> Fernando Patino, Jr., *Appellee-Plaintiff* | October 31, 2018 <br><br> Court of Appeals Case No. 46A03-1712-CT-2855 <br><br> Appeal from the LaPorte Circuit Court <br><br> The Honorable Thomas J. Alevizos, Judge <br><br> Trial Court Cause No. 46C01-1303-CT-366 |

**Crone, Judge.**

## Case Summary

Brett Carney reported to Michigan City police that Fernando Patino, Jr., took various fixtures from a residence that Carney had purchased at a sheriff's sale. Based on Carney's report, Patino was placed on Michigan City's "most wanted" list, arrested, and charged with a felony. Patino was later found not guilty of the criminal charge. Patino sued Carney for, among other things,

defamation and intentional infliction of emotional distress. Following a trial, the jury awarded Patino $256,000 in damages against Carney.

[2] Carney now appeals, first contending that the trial court erred in denying his pretrial motion for summary judgment on grounds that his statements to police were protected, as a matter of law, by the doctrine of qualified privilege. Carney also contends that the trial court erred in denying his subsequent motion for judgment on the evidence for the same reason. Finally, Carney contends that the jury verdict is excessive and that the trial court should have granted his motion to correct error on that basis. Concluding that the trial court did not err in denying Carney's various motions, and further concluding that the jury verdict is not excessive, we affirm.

## Facts and Procedural History[1]

[3] In February 2011, Patino resided at a home on Franklin Street ("the Residence") in Michigan City that was owned by his father. Patino's father purchased the Residence in 2006 and secured a mortgage on the Residence. Following subsequent foreclosure, the Residence was sold at a sheriff's sale on the morning of February 18, 2011. Carney purchased the Residence at the sale for $33,676.

---

[1] Although Carney appeals the trial court's rulings at various stages of the proceedings, for clarity's sake, we primarily recite the relevant facts most favorable to the jury's verdict.

[4] Immediately after the sale on February 18, Carney proceeded to the Residence to inspect the property. He did not have a key to the Residence, and he did not know if anyone still lived in the Residence. Carney knocked on the door, but when nobody answered, he entered the Residence by using a credit card to pop open the locked door. Upon entry, Carney noted that boxes were present, indicating that the current resident was still in the process of moving. While Carney was at the Residence, Patino arrived. Patino had been told by a coworker at the nearby NAPA Auto Parts store where he worked that someone was at the Residence, so Patino went to investigate. During this relatively uneventful interaction, Carney informed Patino that he had purchased the Residence and intended to take possession of it. Patino gave Carney his name and phone number, and Carney agreed to allow Patino additional time to remove his belongings from the Residence.[2] Carney then left the Residence.

[5] The parties agree that they had a second encounter at the Residence, but they dispute the date as well as what transpired. Patino claims that he decided to remove the remainder of his belongings on the afternoon of February 18 and so he called his father, who rented a U-Haul truck and came to the Residence with Patino's brother. Patino had returned to work, so his father and brother began removing the family's belongings from the Residence. His mother also came over to help clean. Patino joined them shortly thereafter to help with the moving process. At approximately 9:00 p.m. on February 18, while Patino and

---

[2] Carney claims that although Patino gave him a correct phone number, he gave a false name.

his father were still at the Residence, Carney returned to the Residence while Patino was moving the stove he had purchased into the U-Haul. Carney was angry and told Patino that he did not think Patino was allowed to take the appliances. He threatened to call the Michigan City police and stood in the doorway of the Residence to prevent Patino from removing any other items from the Residence. Thus, Patino could not go back in the Residence to retrieve his refrigerator or the washing machine that he had also purchased. Patino decided that it was best just to leave, so he grabbed his dog and walked past Carney to leave the premises. Patino overheard Carney on his cell phone telling an unknown third party, "They took the appliances." Appellant's App. Vol. 2 at 111. Patino and his family drove the U-Haul across the front lawn because Carney's truck was blocking the driveway. Patino and his father returned the U-Haul on February 19, 2011. Patino did not return to the Residence at any point after February 18, 2011.

[6] Carney agrees that the parties had a contentious second encounter at the Residence, but he claims it occurred on the afternoon of February 20, 2011. Carney claims that on that date, he encountered Patino and his father at the Residence, and that he observed two pickup trucks in the driveway loaded with various fixtures that had clearly been taken out of the Residence. Carney claims that after he confronted Patino about taking the items, Patino drove through the yard and fled the premises. Carney then inspected the Residence and discovered numerous missing fixtures and extensive damage to the interior of the Residence.

[7]   Carney contacted Michigan City police on February 20 while he was at the Residence. Officer Brian Richmond came to the Residence to take the report. Carney reported to Officer Richmond that he had purchased the Residence on February 18, that upon inspection that same day he had encountered a young adult Hispanic male (later identified as Patino) who was in the process of moving out, and that the Residence was in good condition at that time. Carney stated that he encountered Patino at the Residence again shortly before the officer's arrival on February 20, and that two pickup trucks in the driveway were loaded with numerous items that should not have been removed from the Residence. Carney stated that he personally observed interior doors, closet doors, light fixtures, a register vent cover, a toilet, a bathroom sink, and shelving in Patino's trucks. Carney reported that he confronted Patino about taking the items, but that Patino and his family simply drove through the yard and fled. Carney stated that his subsequent walk-through of the Residence revealed that the fixtures had been removed from the Residence and damage had been done to the interior of the Residence. Carney did not mention anything about a missing stove or other appliances to Officer Richmond. Carney told Officer Richmond that Patino worked at a nearby NAPA Auto Parts store. Carney also reported that he believed that Patino had purchased and moved to a home on Chicago Street in Michigan City.

[8]   Carney made at least four cell phone calls to Patino after the contentious second encounter. Each time, Carney left a voicemail message that Patino perceived to be threatening. In March 2011, Carney went to NAPA and

confronted Patino about the appliances. He demanded that Patino return the stove and a dryer that Patino had removed from the Residence. When Patino refused, Carney stated, "When we're done with you, we're sending you back to where you came from." *Id.* at 113. Patino's mother was at NAPA at the time, and she overheard what Carney said about the appliances and his threatening statement to her son. Patino, a United States citizen, believed that Carney was referring to his Mexican ancestry and suggesting that he should be deported to Mexico.

[9] Following an investigation of Carney's claims by Michigan City Police Detective Corporal Anthony McClintock, a warrant was issued for Patino's arrest. Patino was also included on the Michigan City Top 10 Most Wanted List that was reported in local media. After learning of the warrant, Patino turned himself in to Michigan City Police. Patino was subsequently charged with class D felony theft for stealing "property" from the Residence. Ex. 4. The criminal charges were pending for approximately five and a half years. Following a jury trial, Patino was acquitted of the theft charge. The whole experience was "like a nightmare" for Patino and his family. Tr. Vol. 3 at 104.

[10] On February 28, 2013, Patino filed a complaint against Carney and numerous other defendants including the City of Michigan City, Indiana, the Michigan City Police Department, Michigan City Police Chief Mark Swistek, and Detective Corporal Anthony McClintock (the "Michigan City Defendants"). Patino alleged claims of false arrest, false imprisonment, libel, slander, defamation, negligent infliction of emotional distress, intentional infliction of

emotional distress, negligence, and violations of his civil and constitutional rights. The matter was removed to the United States District Court for the Northern District of Indiana in April 2013. In November 2013, Patino's federal civil rights claims were dismissed with prejudice as to all defendants. Although the remaining state law claims were initially dismissed without prejudice, they were later remanded back to the LaPorte Circuit Court in December 2013. The claims against the Michigan City Defendants were dismissed by the trial court in April 2014.

[11] Patino filed an amended complaint for damages against Carney alleging that he was falsely arrested by the Michigan City Police Department and charged with class D felony theft based on knowingly false accusations made by Carney. The complaint alleged claims for defamation, negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. Patino sought both compensatory and punitive damages for his economic losses, emotional distress, pain, suffering, and loss of reputation.

[12] Carney filed a motion for summary judgment and designation of evidence in July 2015. Among other things, Carney asserted that his statements to police were qualifiedly privileged and thus he was entitled to judgment as a matter of law as to all of Patino's claims. Patino responded with a motion in opposition to summary judgment and accompanying affidavit. The trial court entered an order denying Carney's summary judgment motion in April 2016.

[13] A jury trial began on September 25, 2017. Prior to the start, Patino withdrew his negligence claims, leaving only his defamation and intentional infliction of emotional distress claims. Patino presented his case-in-chief, and at the close of his evidence, Carney made an oral motion for judgment on the evidence again based upon qualified privilege, which the trial court took under advisement. Carney then presented his evidence, after which he renewed his motion for judgment on the evidence, which the court again took under advisement. Following deliberations, the jury returned a verdict in favor of Patino. The jury awarded total damages in the amount of $320,000 and apportioned fault as follows: Patino 5%, Michigan City Police Department 5%, Detective Corporal McClintock 10%, and Carney 80%. Accordingly, the trial court entered final judgment against Carney in the amount of $256,000.

[14] Carney filed a motion to correct error which was denied by the trial court. The court also entered its order denying Carney's motion for judgment on the evidence. Carney now appeals the court's denial of his motion for summary judgment, the denial of his motion for judgment on the evidence, and the denial of his motion to correct error.

## Discussion and Decision

### Section 1 – The trial court did not err in denying Carney's motion for summary judgment on the basis of qualified privilege.

[15] Carney first argues that the trial court erred in denying his pretrial summary judgment motion. "The purpose of summary judgment is to terminate litigation

about which there can be no factual dispute and which can be determined as a matter of law." *Lamb v. Mid Indiana Serv. Co.*, 19 N.E.3d 792, 793 (Ind. Ct. App. 2014). "The party moving for summary judgment has the burden of making a prima facie showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Mint Mgmt., LLC v. City of Richmond*, 69 N.E.3d 561, 564 (Ind. Ct. App. 2017). If the moving party meets its burden, "the burden then shifts to the nonmoving party whose response must set forth specific facts indicating that there is an issue of material fact." *Venture Enter., Inc. v. Ardsley Distrib., Inc.*, 669 N.E.2d 1029, 1032 (Ind. Ct. App. 1996). "The nonmovant may not rest upon bare allegations made in the pleadings, but must respond with affidavits or other evidence setting forth specific facts showing there is a genuine issue in dispute." *Id.* Any doubts as to any facts or inferences to be drawn from those facts must be resolved in favor of the nonmoving party. *Mint Mgmt.*, 69 N.E.3d at 564.

[16] "We review a summary judgment ruling de novo." *Pelliccia v. Anthem Ins. Cos.*, 90 N.E.3d 1226, 1230 (Ind. Ct. App. 2018). A trial court's findings and conclusions offer insight into the rationale for the court's judgment and facilitate appellate review but are not binding on this Court. *Henderson v. Reid Hosp. & Healthcare Servs.*, 17 N.E.3d 311, 315 (Ind. Ct. App. 2014), *trans. denied* (2015). We may affirm a summary judgment ruling on any theory supported by the designated evidence. *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013). The party that lost in the trial court has the burden of persuading us that the trial court erred. *Estate of Hofgesang v. Hansford*, 714 N.E.2d 1213, 1216 (Ind. Ct.

App. 1999). Our supreme court has cautioned that summary judgment "is not a summary trial" and Indiana consciously errs on the side of letting even marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims. *Hughley v. State*, 15 N.E.3d 1000, 1003-04 (Ind. 2014).

[17] Carney asserts that, even if defamatory,[3] his statements to law enforcement concerning Patino were qualifiedly privileged, and thus he was entitled to summary judgment as to Patino's claims. A qualified privilege "applies to communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he had a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992) (citation omitted). As a defense to defamation, the qualified privilege operates not to "change the actionable quality of the words published, but merely [to] rebut[] the inference of malice that is [otherwise] imputed." *Holcomb v. Walter's Dimmick Petroleum, Inc.*, 858 N.E.2d 103, 106 (Ind. 2006) (citation omitted).[4] It is well established that "communications made to law

---

[3] Defamation is that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff." *Davidson v. Perron*, 716 N.E.2d 29, 37 (Ind. Ct. App. 1999) *trans. denied* (2000). "To establish defamation, the plaintiff must prove the following elements: (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages." *Id.* A communication is defamatory *per se* if it imputes criminal conduct. *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007).

[4] Although Patino's amended complaint raised several claims in addition to defamation, the basis of each claim was Carney's purported false statements to law enforcement. Thus, Carney asserts that he was entitled to summary judgment on all of Patino's claims based on the qualified privilege defense. Indeed, the qualified privilege defense to defamation has also been applied to claims of false imprisonment, negligence, and intentional infliction of emotional distress. *Brown v. Indianapolis Housing Agency*, 971 N.E.2d 181, 186 (Ind. Ct. App. 2012).

enforcement to report criminal activity are qualifiedly privileged." *Williams v. Tharp*, 914 N.E.2d 756, 763 (Ind. 2009) (quoting *Kelley v. Tanoos*, 865 N.E.2d 593, 600 (Ind. 2007)). This furthers the compelling public interest of encouraging citizens not only to report suspected wrongdoing but also to assist law enforcement in investigating and apprehending persons who engage in criminal activity. *Id*. at 762-63. Our supreme court has stated,

> If this purpose is to be met, the privilege must offer a robust defense against liability. Protecting unverified and even speculative reports of suspected wrongdoing to law enforcement is, in our view, supported by ample reasons of social advantage. It is important that citizens not opt for inaction, chilled from communicating with police in all but the most certain of situations.

*Id*. at 765.

[18] The privilege, however, "is not without limits: a statement 'may lose its privileged character upon a showing of abuse wherein: (1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statement; or (3) the statement was made without belief or grounds for belief in its truth.'" *Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 548 (Ind. Ct. App. 2015) (quoting *Bals*, 600 N.E.2d at 1356), *trans. denied* (2016). Thus,

> the burden is upon the defendant in the first instance to establish the existence of a privileged occasion for the publication, by proof of a recognized public or private interest which would justify the utterance of the words. Then the plaintiff has the

> burden of overcoming that privilege by showing that it has been abused. When speaking of abuse, the essence of the concept is not the speaker's spite but his abuse of the privileged occasion by going beyond the scope of the purposes for which privilege exists. And unless only one conclusion can be drawn from the evidence, the question of whether the privilege has been abused is for the jury.

*Williams*, 914 N.E.2d at 762 (citations, quotation marks, and alterations omitted).

[19]  We agree with Carney that the privileged occasion implicated by his communication to law enforcement related to the public interest in encouraging private citizens to report crime. Patino contends that Carney abused the privilege because, when he reported that Patino removed numerous fixtures from the Residence, he was primarily motivated by ill will and made the statement without belief or grounds for belief in truth. Carney claims that Patino presented no evidence but simply offered "speculation about the intent or knowledge of Carney in making the statement." Appellant's Br. at 33. "It is well settled, however, that '[s]ummary judgment must be denied if the resolution hinges upon state of mind, credibility of the witnesses, or the weight of the testimony.'" *Bah*, 37 N.E.3d at 548 (quoting *Nelson v. Jimison*, 634 N.E.2d 509, 512 (Ind. Ct. App. 1994)). This is precisely the scenario that confronted the trial court here.

[20]  It is undisputed that, prior to Carney's communication to law enforcement, Patino and Carney had an extremely contentious second encounter. Patino

presented evidence that, although he was not even at the Residence on February 20, Carney told police that he personally observed Patino at the Residence on that date in possession of various fixtures taken from the Residence. According to Patino, it was his belief that Carney was upset that, a few days earlier, Patino removed certain appliances from the Residence that Patino had purchased, and that motivated Carney to fabricate a story about his observations on February 20 and to accuse Patino of the theft of numerous fixtures. Patino designated evidence in support of this motivation. He averred that Carney expressed his clear dismay and objection to the appliance removal when Patino was removing the stove on February 18, and that Carney confirmed those feelings when he subsequently went to Patino's place of employment and made what appeared to be a racially charged threat to send Patino "back to where [he] came from" if he did not return the appliances. Appellant's App. at Vol. 2 at 113.

[21] Viewing the designated evidence and resolving all doubts in favor of Patino as the nonmoving party, as we must, we conclude that it was for a jury to determine whether Carney was primarily motivated by ill will in accusing Patino of theft and/or whether his accusations were made without belief or grounds for belief in their truth.[5] In other words, we cannot say that only one conclusion can be drawn from the evidence. Rather, the evidence presented,

---

[5] Carney asserts that Patino failed to designate evidence that Carney's statements to police were, in fact, false. However, in his affidavit, Patino denied being at the Residence on February 20 or being in possession of the fixtures. This, in effect, is an averment that Carney's statements to the contrary were, in fact, false.

and the reasonable inferences to be drawn therefrom, was sufficient to establish a genuine issue of material fact on whether the qualified privilege had been abused, and therefore Carney was not entitled to summary judgment on Patino's claims based on the qualified privilege defense. Accordingly, the trial court did not err when it declined to enter summary judgment for Carney.[6]

## Section 2 – The trial court did not err in denying Carney's motion for judgment on the evidence on the basis of qualified privilege.

[22] Carney next asserts that the evidence presented by Patino at trial "was insufficient to overcome the application of the [qualified] privilege" and therefore his motion for judgment on the evidence should have been granted. Appellant's Br. at 19. The standard of review for a challenge to a ruling on a motion for judgment on the evidence is the same standard utilized by the trial court in making its decision. *Bals*, 600 N.E.2d at 1357. We look only to the evidence and reasonable inferences therefrom most favorable to the nonmoving party. *Id*. The motion should be granted only where there is no substantial

---

[6] Carney briefly argues that the trial court erred in failing to enter at least partial summary judgment on Patino's defamation claim because Patino's amended complaint "failed to plead the alleged defamatory statements with any specificity." Appellant's Br. at 35. Carney did not assert this as grounds for summary judgment in his original brief in support of summary judgment. Indeed, his only mention of this alleged lack of specificity is a passing reference in a footnote in his reply brief in support of summary judgment. This was insufficient to alert the trial court to this argument. It is well settled that arguments not presented to the trial court on summary judgment are waived on appeal. *Anderson v. Four Seasons Equestrian Ctr., Inc.*, 852 N.E.2d 576, 581 (Ind. Ct. App. 2006), *trans. denied*. The trial court cannot be found to have erred as to an issue or argument that it never truly had an opportunity to consider. *Id*. Thus, Carney has waived this argument, and we will not consider it on appeal.

evidence supporting an essential issue in a case. *Id*. (citing Ind. Trial Rule 50(A); *Johnson v. Naugle*, 557 N.E.2d 1339, 1342 (Ind. Ct. App. 1990); *Whisman v. Fawcett*, 470 N.E.2d 73, 79 (Ind. 1984)).

[23] Our supreme court has stated that determining whether evidence was sufficient to defeat a motion for judgment on the evidence requires both a quantitative and a qualitative analysis. *Purcell v. Old Nat'l Bank*, 972 N.E.2d 835, 840 (Ind. 2012). Specifically, the court explained,

> Evidence fails quantitatively only if it is wholly absent; that is, only if there is no evidence to support the conclusion. If some evidence exists, a court must then proceed to the qualitative analysis to determine whether the evidence is substantial enough to support a reasonable inference in favor of the non-moving party.
>
> Qualitatively, ... [evidence] fails when it cannot be said, with reason, that the intended inference may logically be drawn therefrom; and this may occur either because of an absence of credibility of a witness or because the intended inference may not be drawn therefrom without undue speculation. The use of such words as "substantial" and "probative" are useful in determining whether evidence is sufficient under the qualitative analysis. Ultimately, the sufficiency analysis comes down to one word: "reasonable."

*Id*. (citations and some quotation marks omitted). Unlike a motion for summary judgment under Indiana Trial Rule 56, the sufficiency test of Indiana Trial Rule 50(A) is not merely whether a conflict of evidence may exist, but rather whether there exists probative evidence, substantial enough to create a reasonable inference that the nonmovant has met his burden. *Id.* at 841.

[24] Here, Patino presented sufficient evidence to meet both the quantitative and qualitative elements of the judgment on the evidence analysis. Our thorough review of the trial transcript and the totality of the testimony presented reveals that Patino presented sufficient evidence to show that Carney was not being truthful when he told police that Patino was at the Residence on February 20, and that he witnessed Patino removing various fixtures from the premises on that date.[7] Patino also presented substantial evidence to create a reasonable inference that Carney was primarily motivated by ill will in making his statement to police and/or that he made the statement without belief or grounds for belief in its truth. In other words, we are confident that enough credible evidence was presented from which an inference that Carney abused his qualified privilege could be found by a reasonable jury without engaging in undue speculation.

[25] Carney essentially suggests that his abuse of the qualified privilege could not be established absent direct testimony from him admitting that his statements to law enforcement were in fact motivated by ill will or that he made the statements without belief or grounds for belief in their truth. He is mistaken. Viewing only the evidence and reasonable inferences therefrom most favorable to Patino as the nonmoving party, there was substantial evidence presented to

---

[7] Carney emphasizes that he never reported to law enforcement that he saw Patino actually taking the fixtures out of the Residence, only that he encountered Patino in the driveway of the Residence already in possession of the fixtures that had been taken out of the Residence. We find this to be a distinction without a difference.

overcome Carney's qualified privilege defense. Accordingly, the trial court did not err in denying Carney's motion for judgment on the evidence.

## Section 3 – The jury verdict is not excessive, and the trial court did not abuse its discretion in denying Carney's motion to correct error.

Following the trial court's entry of judgment on the jury's award of $256,000 in damages to Patino, Carney filed a motion to correct error asserting that he was entitled to a new trial due to "the excessiveness of the jury verdict." Appellant's App. Vol. 5 at 158. This Court has explained that the remedy offered by Indiana Trial Rule 59(J)(5) is "available only where the evidence is insufficient to support the verdict as a matter of law." *Solnosky v. Goodwell*, 892 N.E.2d 174, 184 (Ind. Ct. App. 2008) (quoting *City of Carmel v. Leeper Elec. Servs., Inc.*, 805 N.E.2d 389, 392 (Ind. Ct. App. 2004), *trans. denied*). Once the trial court has entered final judgment on the evidence for the amount of proper damages, we will reverse the decision only for an abuse of discretion. *Id*.

We afford a jury's damage award great deference on appeal. *Sims v. Pappas*, 73 N.E.3d 700, 709 (Ind. 2017). In considering whether a jury verdict is excessive, we do not reweigh the evidence and look only to the evidence and reasonable inferences that may be drawn therefrom that support the verdict. *West v. J. Greg Allen Builder, Inc.*, 92 N.E.3d 634, 643 (Ind. Ct. App. 2017), *trans. denied* (2018). If there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting, the award will not be disturbed. *Sandberg Trucking, Inc. v. Johnson*, 76 N.E.3d 178, 189 (Ind. Ct. App. 2017). "To warrant

reversal, the award must appear to be so outrageous as to impress the Court at first blush with its enormity." *Id.* (citation and quotation marks omitted). An award is not excessive unless the amount cannot be explained upon any basis other than prejudice, passion, partiality, corruption, or some other element of improper consideration. *Sims*, 73 N.E.3d at 709.

[28] Carney complains that "Patino presented no medical expenses, no lost wages, and no documented losses of any kind" to support the jury's damage award. Appellant's Br. at 44. He argues that "[e]ven if there is an emotional toll associated with being charged with a crime, there is no justification for so large a verdict." *Id.* at 45. We disagree.

[29] "Awards for pain, suffering, fright, humiliation, and mental anguish are particularly within the province of the jury because they involve the weighing of evidence and credibility of witnesses." *Landis v. Landis*, 664 N.E.2d 754, 757 (Ind. Ct. App. 1996). Indeed, "[p]hysical and mental pain are, by their very nature, not readily susceptible to quantification, and therefore, the jury is given very wide latitude in determining these kinds of damages." *Groves v. First Nat'l Bank of Valparaiso*, 518 N.E.2d 819, 831 (Ind. Ct. App. 1988). "Our inability to actually look into the minds of jurors and determine how they computed an award is, to a large extent, the reason behind the rule that a verdict will be upheld if the award falls within the bounds of the evidence." *Griffin v. Acker*, 659 N.E.2d 659, 664 (Ind. Ct. App. 1995).

The evidence favorable to the verdict reveals that, in addition to the monetary cost incurred in defending his criminal trial, Patino suffered great mental and emotional pain due to the highly publicized charge and arrest. His criminal case was pending for more than five years, and he presented evidence of the negative impact that it had, and continues to have, on both his personal and professional life. Under the circumstances, the $256,000 award is not so outrageous as to indicate that the jury was motivated by prejudice, passion, partiality, corruption, or some other element of improper consideration. Carney has failed to persuade us that the trial court abused its discretion in denying his motion to correct error.[8] We therefore affirm the verdict and the trial court's judgment entered thereon.

Affirmed.

Najam, J., and Pyle, J., concur.

---

[8] Carney also argues that the verdict should be set aside because the "evidence presented should have led the jury to conclude that the qualified privilege applied." Appellant's Br. at 42. This is essentially a request for us to reweigh the evidence and reassess witness credibility on the issue of whether he abused the privilege, which we cannot do. *See West*, 92 N.E.3d at 643 (when party seeks to reverse adverse judgment on basis of insufficient evidence, appellate court will not weigh evidence or assess witness credibility). Carney also briefly submits, without citation to authority, that the jury's allocation of 80% fault to him for Patino's injuries was unreasonable. It is well settled that the allocation of fault is entrusted to the sound judgment of the factfinder. *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1056 (Ind. 2003). Carney's sole argument in this regard appears to be simply a disagreement with the jury's conclusion. Without more, we decline to address the issue further.