

FILED

May 22 2020, 7:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Karen T. Moses
Kevin J. Mitchell
Sarah K. Noack
Faegre Baker Daniels LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEES

Aaron D. Grant
John C. Trimble
A. Richard M. Blaiklock
Lewis Wagner, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Helena Agri-Enterprises, LLC, f/k/a Helena Chemical Company, | May 22, 2020 |
| *Appellant-Plaintiff/Counter-Defendant*, | Court of Appeals Case No. 19A-PL-2119 |
| | Appeal from the Harrison Circuit Court |
| v. | The Honorable John T. Evans, Judge |
| Robert M. Jones, Mark A. Jones, and Jones Farms, | Trial Court Cause No. 31C01-1512-PL-28 |
| *Appellees-Defendants/Counter-Claimants*. | |

**Brown, Judge.**

Helena Agri-Enterprises, LLC ("Helena") appeals the trial court's judgment in favor of Robert M. Jones, Mark A. Jones, and Jones Farms (the "Farm" and, collectively with Robert and Mark, "Jones Farms"). Helena raises three issues which we consolidate as:

I. Whether the trial court abused its discretion in admitting certain testimony concerning damages and test results; and

II. Whether the trial court erred in entering judgment for damages in the amount awarded by the jury in favor of Jones Farms.

We affirm.

### Facts and Procedural History

A. *Background*

   1. *Jones Farms and INW0412 Wheat*

Brothers Robert and Mark operate the Farm, which their father started in Bradford, Indiana, and which grew and sold seed wheat to the Scott Seed Company starting in the 1960s and have produced seed wheat since then for Voris Seeds and Limagrain.[1] In the early 2000s, Robert and Mark approached the Indiana Crop Improvement Association ("ICIA"), a seed-certifying agency that has its own laboratory and certifies all plants, seeds and plant parts, about developing seed wheat. The ICIA directed them to Ag Alumni Seed ("Ag

---

[1] Seed wheat, or wheat produced to sell its seeds to other farms, involves additional management and requires "a lot more steps" than grain elevator wheat in order to generate quality product at higher yields. Transcript Volume II at 195.

Alumni"), an organization that began by taking "a little bit of seeds from the breeders at Purdue and mak[ing] a lot of seed with it and then supply[ing] that to growers" and which continued to be involved until the present day in the development of new wheat varieties. Transcript Volume III at 122.

[3]     For about three years, Robert and Mark traveled to Ag Alumni's Evansville, Indiana location, where they learned management techniques to increase grain seed yield and other desirable qualities, including test weight.[2] In 2006, Robert licensed from Ag Alumni a Purdue wheat variety by the name of INW0412, which was bred to be taller and had "met the need" in southern Indiana – where it had "really found a home" and "worked much better than it did in other areas" – for wheat with "a little bit more straw."[3] *Id.* at 129. Ag Alumni had conducted performance trials of INW0412, and it yielded an 89.4 bushel per acre average across five locations in 2004, and a 102 bushel per acre average

---

[2] Test weight is the measure of the density of the grain, or weight per unit volume. Robert testified that test weight was the main desirable quality in the wheat business and was necessary to "compete against the giants" in the industry. Transcript Volume III at 169.

[3] According to Gary Duncan, who advised Ag Alumni and helped release the wheat variety, INW0412 was a "great yielder," averaged in height at "39 inches" whereas typical wheat height was "30 to 36" with most in the "35, 36 range," and produced more straw, which was positive "[e]specially if you're wanting it for hay." Exhibits Volume I at 28, 33-34. Duncan also testified a "good quality hay [was] very, very important" to Kentucky horse breeders. *Id.* at 33. Jay Hulbert, the President and CEO of Ag Alumni, indicated that additional straw was desirable for baling, a fact which was "particularly true in horse country." Transcript Volume III at 129.

across nine locations in 2005, with one location in north central Indiana yielding 142 bushels per acre.[4]

[4] Jones Farms tested INW0412, conducted intensive management in strips to understand how to handle and take it to yield, and discovered what was needed to "go into th[e] project full bore."[5] *Id.* at 171. Ag Alumni discontinued producing INW0412 in 2012 and gave Robert the sole authorization to continue producing and to maintain seed of that variety for sale, and Jones Farms stopped paying royalties to Ag Alumni for the wheat seed. From 2011 to 2013, Jones Farms sold 1,107 units of INW0412 at a minimum of $21.00 each.[6]

### 2. *The Note and the Credit Agreement*

[5] In June 2013, Jones Farms executed a Promissory Note (the "Note"), which indicated a maturity date of "6/10/2014" and that Jones Farms promised to pay Helena, an agricultural formulator and distributor which offered chemical products and application services, provided loans, and extended credit, a principal amount of $1,500,000, and signed a Credit Sales and Services Agreement (the "Credit Agreement"). Exhibits Volume I at 5. Both the Note

---

[4] At the jury trial, the court admitted an exhibit attached to the certified transcript of the deposition of Gary Duncan which is titled "INW0412" and indicates, under the heading "Performance," a "5 Location Avg. 2004" of 89.4 bu/ac, a "9 Location Avg – 2005" of 102.0 bu/ac, and "142 bu/ac vs. 25R47 at132 [sic] in North Central Indiana." Exhibits Volume III at 128.

[5] At trial, Robert indicated intense management was conducted in strips when testing, instead of across the entire field, "so that you can see a difference and take it to yield." Transcript Volume III at 170.

[6] In the seed business, a farmer sells "50 pounds of wheat in a seed unit." Transcript Volume II at 195.

and the Credit Agreement were "standard forms used by Helena," Robert was unable to negotiate the terms of the credit arrangement, and according to the trial testimony of Wes Belleville, Helena's director of credit, Helena invoiced products sales under the Credit Agreement and "paid through" the Note any invoices that resulted. Transcript Volume II at 133, 156. The Credit Agreement, which provided it would be governed by Tennessee law, included a limitations provision stating in part that "in no event shall damages or any other recovery of any kind against Helena . . . exceed the price of the specific goods or services which cause the alleged loss, damage, injury or other claim." Exhibits Volume I at 7 (capitalization omitted).

[6] At some point, Jones Farms also contracted with Helena to spray its fields with a fungicide to control head scab, an insecticide to kill insects that would damage the wheat, and "Coron," a foliar nitrogen that would help the plant grow more wheat. Transcript Volume II at 118.

### 3. *2014 Harvest and Spraying Incident*

[7] In Fall 2013, Gary Geswein of Geswein Farms, LLC, purchased wheat seed from Jones Farms, including 60 units of the treated INW0412 at a price of $27.50 per unit. During the same season, using quality seed maintained from previous harvests, Jones Farms planted 284 acres of INW0412 wheat "with intentions of a seed crop" for harvest the following summer. Transcript Volume III at 97. Robert visited the fields in early May 2014 and, at "several areas in the field," placed screwdrivers twelve inches apart, took "those plants" and pulled them out,

and counted the number of "tillers there are in that area" and the number of seeds that "would be in those spots."[7] *Id.* at 175. At that point in time, he calculated a yield "at or around 110 bushel [sic] an acre" and lowered the estimate, "as we'd always done in the years past," to 101 bushels an acre. *Id.*

[8] "[O]ne or two days" later, a spray service provider hired by Helena sprayed the wheat seed crop using a solution that contained herbicides, or chemicals that kill plants, in addition to the products for which Jones Farms had contracted.[8] *Id.* at 175. Upon noticing damage to the crop, Robert notified Helena immediately, and Helena dispatched an agronomist in early June to investigate. Robert was informed not to harvest the wheat which had been sprayed, and wheat samples shipped to SD Ag Labs indicated contamination at levels "likely high enough to cause crop injury." *Id.* at 61. Helena charged Jones Farms for the solution and the application.

[9] "[V]ery desperate" to locate INW0412 seeds, Robert contacted Ag Alum, which advised that no more seeds were available, and Jones Farms attempted "no less than ten more strains of wheat" in an effort to identify other wheat crops which would "serve [it] well" in returning to the wheat seed business. *Id.* at 200. After attorneys contacted Ag Alum regarding the instant litigation, it located in early

---

[7] After testifying he counted "how many tillers there are in that area," Roberts stated: "And then I count how many – that would be how many heads that would be." Transcript Volume III at 175.

[8] The spraying service provider used by Helena had been spraying herbicides the previous day, did not properly clean its tanks, and a "small residue of those chemicals left over" was "part [sic] sprayed on the wheat crop at issue in this case." Transcript Volume III at 65.

2017 a "couple of" small, nine-year-old samples of INW0412 in the back of a cold storage room and delivered "a very small amount of seed" to ICIA's chief operating officer, Joe Deford, to conduct germination tests. *Id.* at 130-131.

[10] Meanwhile, on August 29, 2014, Helena area manager Brian Mattingly sent Robert an email message which stated in part:

> 2. 2014 Past due amount – We need to confirm when 2014 inputs will be paid. Is your banker going to cover the 2013 and 2014 balances in the operating line they are talking to Wes about? Roughly $2.4 million?
>
> * * * * *
>
> 4. Wheat complaint – We cannot settle anything until the insurance company has all of the information they need for yield and price. We cannot do anything until we see the settlement number for the insurance adjuster. Please submit this information as soon as possible so we can proceed after the insurance company submits the settlement.

Exhibits Volume I at 123. Robert responded in a message which stated: "On item . . . #2 is Helena finance for 2014 as we discussed yesterday . . . #4 there is no issue with us on settlement we have been waiting patiently for someone to notify us period you witnessed that yesterday in office." *Id.* The following day, Mattingly sent a message that stated in part: "2. The way I understand it the 2014 inputs for this year's crop need[] to be paid before we commit to financing the 2015 inputs (starting fall business). Wes can confirm." *Id.* Belleville and Jones Farms communicated again in January and February 2015, with Jones

Farms mentioning it was "working with another lender for our outstanding 2013 and 2014 Acct. Balances Started 1-23-15." *Id.* at 125.

B. *Procedural History*

On December 1, 2015, Helena filed a complaint against Jones Farms, which sought recovery, plus interest and attorney fees, for breach of promissory note and breach of credit sales and services agreement and alleged: Jones Farms breached the Note by failing to pay a principal amount of $1,462,569.77 which was owed by June 10, 2014; and that, as of October 23, 2015, Helena extended credit pursuant to the Credit Agreement in the principal amount of $1,306,974.10 plus accrued unpaid interest, an amount Jones Farms failed to timely pay. Jones Farms filed an amended answer stating the alleged principal amount under the Note was incorrect, "as amounts were drawn for erroneous charges that [Helena] previously agreed were billed in error and did not correct"; and the alleged principal amount under the Credit Agreement was incorrect, as it reflected "erroneous charges billed to Defendant that [Helena] agreed were billed in error and did not correct." Appellant's Appendix Volume II at 34. Jones Farms also filed an amended counterclaim which sought recovery for breach of contract, negligence, setoff, and a recoupment for any amount owed to Helena, and demanded attorney fees, costs, and an "amount reasonable to compensate" for damages to the 2014 seed wheat crop, the subsequently planted 2014 corn crop, and their ability to obtain appropriate crop insurance in the future, and for the "total destruction" of the specialty INW0412 wheat strain for sales to Jones Farms's future customers. *Id.* at 40.

[12] On February 10, 2017, Helena filed a motion for partial summary judgment on its claims. An attached memorandum stated that, as of December 15, 2016, Jones Farms was indebted under the Note for a total amount of $1,702,868.40, which reflected the principal and accrued unpaid interest in the amount of $240,298.63, and under the Credit Agreement in the principal amount of $1,063,072.56, plus interest in the amount of $483,092.89, for a total of $1,546,165.45. Helena designated: an affidavit by Belleville, Helena's credit manager at the time, which indicated Jones Farms's indebtedness under the Note and Credit Agreement and stated that Jones Farms took credit advances under the Credit Agreement from June 12, 2013, to June 10, 2014, in the principal amount of $1,063,072.56; and a portion of Jones Farms's answers to Helena's first set of interrogatories in which Jones Farms answered that any indebtedness Helena claimed to be owed was more than offset by the damages Jones Farms suffered from the contaminated application.

[13] On March 13, 2017, Jones Farms filed a response in opposition to Helena's motion for partial summary judgment and designated a report Dr. Stan Smith ("Dr. Smith") had prepared in response to being asked to calculate damages resulting from the May 2014 spraying of the INW0412 wheat seed crop ("First Report"). Dated March 13, 2017, the First Report listed information he reviewed, including "(9) List of Jones Farms'[s] Customers" and "(11) Jones Farms Statement of Wheat Seed Sales August 2, 2013 to September 22, 2013," and indicated Dr. Smith had valued the loss of the 2014 INW0412 seed crop by calculating the expected net revenues from the crop minus the value of the non-

incurred expenses,[9] and valued the loss of the INW0412 Seed Brand by calculating the loss the same as one would the loss of a business.[10] Appellant's Appendix Volume II at 188. That same day, the court stayed Helena's motion pending resolution of discovery issues.

---

[9] Specifically, the First Report stated:

> Based on Jones Farms pre-ordered sales of 35,765 units of INW0412 wheat seed at a price of $25.50 per unit, the expected gross revenues in 2014 are $912,008. For the 300 acres under cultivation for seed wheat, Mr. Jones reports that his 2014 costs were $428.86 per acre, for a total of $128,658. . . . At an average handling and bagging cost of $4 per unit, the total expected handling and bagging costs for the 35,765 units of INW0412 is $143,060. The costs of production for the INW0412 wheat seed are illustrated at $271,718, for expected net revenues of $640,290 for 35,765 pre-sold units of seed. Mr. Jones reports that for the 2014 INW0412 seed crop, the only expenses not incurred prior to the destruction of the crop were the harvesting, handling, cleaning, and processing expenses. He estimates that the harvesting cost of the INW0412 seed would have been $25.00 per acre, which is $7,500 for the 300 acres under INW0412 cultivation. Based on the handling and bagging costs illustrated above at $143,060 for the 2014 crop, the total non-incurred costs for Jones Farms in 2014 were $150,560 after the destruction of the INW0412 crop. For the total expected net revenues of $640,290, and non-incurred costs of $150,560, the net loss for Jones Farms in 2014 is $489,730.

Appellant's Appendix Volume II at 190.

[10] Specifically, the First Report stated:

> [I]n particular, I calculate[d] the cash flows to an investor from the net revenues of the INW0412. The net revenues for INW0412 are estimated at $640,290 in year 2014 dollars, which I grow at the rate of inflation of 0.73 percent in 2015, and an estimated rate of inflation of 2.0 percent in 2016 through 2018. The rate of inflation is based on the Consumer Price Index (CPI-U). . . .

> From an estimated date of trial or resolution of January 1, 2018, the future estimated losses are discounted to a net present value. The discount rate is determined using the buildup method for the cost of capital as described in Duff & Phelps 2016 Valuation Handbook: Guide to Cost of Capital. . . . Assuming a long-term average growth rate of 2.0 percent for CPI growth, net discount rate is estimated a 17.80%. . . .

> Tables 1 through 3 show the loss of earnings for Jones Farms from the destruction of the INW0412 seed from 2014 over the next 25 years. The net loss of earnings is estimated at $6,376,634 through year 2038, but the losses through any year may be calculated based on table 3. For example, if Mr. Jones reports that his ongoing seed testing process could deliver a replacement seed to market in year 2021, then the loss would be the cumulative loss of earnings through 2020 of $3,969,858. If Jones Farms is unable to deliver a seed to market until year 2025, then the loss would be the cumulative loss of earnings through 2024 of $5,150,023.

Appellant's Appendix Volume II at 190-191.

[14]     On April 13, 2017, Helena filed a motion for summary judgment on Jones Farms's counterclaims that stated Jones Farms sought damages in an amount in excess of $3,000,000 and the Note and Credit Agreement contained a limitation of liability and limitation of remedy barring the relief sought. The court denied the motion in an order which found issues of material fact existed which impacted whether the liability provision applied to Jones Farms's claims.

[15]     On March 20, 2019, Helena deposed Dr. Smith, and filed on July 23, 2019, three motions in limine.[11] The first motion sought to exclude damages testimony, including "any and all" evidence, exhibits, testimony, references to testimony, or argument "in any way" which related to alleged calculated damages "based on the anticipated sale of 35,765 units of seed wheat," and in doing so, pointed to the First Report and alleged Jones Farms's "entire damages theory" hinged on presales. *Id.* at 54-55. The second motion sought to exclude Dr. Smith's testimony on the topic of damages, alleged his opinions were based on inadmissible evidence and not properly the subject of expert opinion, and attached excerpts from his March 20, 2019 deposition. The third motion sought to exclude the testimony of ICIA chief operating officer, Joe Deford, regarding a germination test he performed on INW0412 seeds, and it stated the test was not conducted pursuant to industry standards, its results were not reliable, and that Deford should be barred from testifying because Jones Farms failed to disclose

---

[11] On the same day Helena filed seven motions in limine in total concerning testimony and evidence, four of which are not the subject of this appeal.

him as an expert witness. To the third motion, Helena attached Jones Farms's April 3, 2019 Fifth Supplement to Answers to its First Set of Interrogatories in which Jones Farms identified, as a person believed to have knowledge of any facts relating to the litigation, Joe Deford, the "Chief Operating Officer of [ICIA] . . . who read the germination tests performed on the INW0412 treated and untreated seeds provided by [Ag Alum] in March 2017." *Id.* at 157.

[16] On July 31, 2019, the court held a pretrial conference and heard argument on Helena's motions in limine. On August 8, 2019, it issued an order which: granted the first motion concerning presold wheat testimony "such that Jones [Farms] may not use terms such as 'pre-sold' or 'pre-ordered' without first establishing that said wheat was sold or ordered prior to loss"; denied the second motion concerning Dr. Smith's testimony and stated that, "[h]owever, regarding lost profits, [the] damages claim may include lost profits only so long as Jones [Farms] presents evidence sufficient to allow the jury to estimate the amount with a reasonable degree of certainty and exactness and not simply conjecture or speculation"; and denied the third motion concerning Deford's testimony. *Id.* at 177.

[17] On August 23, 2019, Helena filed an objection and motion to strike a supplement to discovery, which stated Jones Farms had filed an amended expert report for Dr. Smith ("Second Report") at the July 31, 2019 pretrial conference that, it alleged, contained an entirely new methodology, different monetary damages, and a new opinion not found in the First Report. It also stated that, on August 22, 2019, Jones Farms had filed a Second Amended

Report ("Third Report"), which presented different damages figures and calculations from the previous two reports, and Dr. Smith appeared to argue in the Third Report that "the value of the wheat crop is based on anticipated 'market price' whereas he previously testified that the value was determined based on pre-sales to established customers." *Id.* at 182. Helena attached copies of all three reports.

[18] On September 3, 2019, a five-day jury trial began, and after hearing argument outside the presence of the jury on Dr. Smith's reports, the court denied Helena's objection and motion to strike. In the jury's presence, Robert testified about the unique management required by a wheat seed crop like INW0412. He testified Jones Farms had fields of INW0412 which produced a hundred bushels or more per acre, his different treatment of the 284 acres of INW0412 compared with previous wheat crops was for the purpose of "exceed[ing] a hundred bushels an acre," and he was "on track" to do that with the 284 acres. Transcript Volume IV at 19. He indicated he visited the fields "one or two days before Helena sprayed with the aerial applicator" in May 2014 and stated that, at that time, he calculated the yield at or around 110 bushels, which he subsequently lowered to 101 bushels, "for benefit of the doubt," by taking a "percentage off . . . as we'd always done in years past." Transcript Volume III at 174-175. He indicated he was reasonably confident he could produce 101 bushels per acre and, when asked to use that figure to explain the level of production he reasonably expected from the 284 acres, he answered: "It would be 32,700 units." *Id.* at 176.

[19] Phil Needham, who worked in the wheat seed sector and owned an agriculture agronomy consulting firm that advised globally and on wheat production, testified "you should be able to raise 100 bushel wheat most years if it's intensively managed with the inputs that are associated with intensive wheat production." Transcript Volume II at 198. During cross-examination, he indicated a farm could adjust yields within reason and add ten or twenty bushels per acre of wheat "just by improving the management." *Id.* at 229. When asked about Jones Farms's production, Needham stated he had worked with producers that have raised hundred-bushel wheat and "again the climate is similar, the soils are similar, the rainfall's similar[,] the temperatures, everything you can think about, I'm telling you that a hundred-bushel wheat is extremely practical and possible most years." *Id.*

[20] The court admitted as Helena's Exhibit 15 a list Robert had provided during discovery of farmers he claimed were going to buy wheat seed. During cross-examination, Robert agreed he "had nobody" who was a guaranteed purchaser, and the following exchange occurred:

> Q . . . . So none of the people that are listed here – for example, McAfee, who was going to buy a couple thousand bushels, according to you – 3,000, according to you, McAfee Brothers, they weren't going to buy that, were they?
>
> A No.
>
> Q Okay. So you have absolutely no proof that anybody was going to buy any of the 2014 –
>
> A No.

Transcript Volume IV at 11-12. He indicated during recross-examination he had good prospects for the seed on the list and "many others" in Jones Farms's customer list base. *Id.* at 20. During his testimony, Geswein of Geswein Farms, LLC, testified he bought treated wheat seed from Jones Farms in Fall 2013, including 60 units at $27.50 per unit, in 2014 his INW0412 crop did very well, he was pleased with the quality of the INW0412, and that he would have bought it in the future.

[21] Regarding wheat seed price and costs, Needham testified that "anybody in the seed business would be able to sell their wheat for $25 to $30 per 50-pound unit." Transcript Volume II at 195. When asked about the reasonable range of sale prices in 2014 for good quality wheat seed, he answered "$25 to $30 per 50-pound unit would be the going price for a bag of certified, cleaned wheat in a bag." *Id.* at 203. When asked to provide a reasonable opinion on the costs involved, figuring 284 acres in southern Indiana, he indicated that, with all the intensive inputs, "it would be between four and five hundred dollars an acre" and that additional post-harvest costs, including cleaning, drying, and bagging, would amount to about five dollars per acre. *Id.* at 203.

[22] Regarding the agreements and billing invoices between Helena and Jones Farms, the court admitted as exhibits during Belleville's testimony certain Helena finance loan statements and individual invoices for various products that "would have been billed out under the open account." *Id.* at 133. Belleville referenced a certain finance loan statement and indicated that $1,297,832.77 was inclusive of interest and principal, that the amount did not become due until June 10, 2014,

and that, "up until that time, there was nothing due and owing on this loan to Helena." *Id.* at 151. During his testimony, Robert answered in the negative when asked if he had any ability to negotiate the terms of the credit arrangements. He testified he received both an invoice for Helena's aerial application service of the products and an invoice for the spraying products themselves. He answered affirmatively when asked if other bills were included in Helena's billings that were improper and should not have been charged.

[23] Jay Hulbert, the CEO of Ag Alum, testified about the 2017 discovery of INW0412 seed in Ag Alum's cold storage and its subsequent testing. Following an objection by Helena's counsel, the court indicated a request had been made, which it approved, to pause Hulbert's testimony to allow Deford to testify. Deford indicated his trial testimony was pursuant to a subpoena and that in 2017 he had been contacted by Hulbert to conduct germination tests of INW0412. He answered in the negative when asked if he approached the INW0412 testing in a fashion different than he had any other germination testing. Deford commented on the germination test results: "As I recall, one lot was treated and one was untreated. One had about a 50 percent rate, the other about 56 or 58 percent rate, to my recollection." *Id.* at 140. When asked how those percentages compare to the standard norms for germination of good seed, he answered: "Much, much, much lower. We would . . . think a new crop seed

would be 90, 95, 98 percent. Oftentimes its above 95 percent."[12] *Id.* When asked to explain whether a seed that passes a germination test "necessarily mean[s] that that seed they planted would grow into a mature, productive plant," he indicated a warm germination test "by its very nature is under optimum conditions," the ideal temperature was "different for different species," and that one could expect field emergence to be less than test emergence, "[g]enerally, every time." *Id.* at 141. He also testified that "vigor" was a measure of the robustness of an individual seed lot, and that germination tests did not measure vigor. *Id.* Helena's counsel cross-examined Deford about the difficulties of seed growing in a field, potential lower germination levels, the test results for INW0412, and the test requirements of germination tests.

[24] Hulbert returned to testify and indicated the germination results were conveyed to him and that "both of the samples tested were in the 50 percent range" and "one was 56 and on was 50, which means about half the seed germinated and grew." *Id.* at 147. Hulbert testified there was not a sufficient quantity of seeds of sufficient quality "for a farmer like the Joneses" to reestablish a wheat crop of INW0412 and that, under the circumstances, it was the expected and prudent decision to try to find a replacement plant. *Id.* During cross-examination, he stated Ag Alum discovered 501 grams of untreated seed and 850 grams of treated seed, which it indicated by email upon discovery it could make "available to Mr.

---

[12] Needham testified "[m]ost states would have a state minimum to be certified of 85 or 90 percent germination. So if a variety didn't germinate 85 or 90 percent, you would not be considered certified." Transcript Volume II at 214.

Jones so he could initiate production" and that "[t]hose are small amounts" and "the seed is old enough that germination could be an issue, but it should be possible over a couple of years to recover production." *Id.* at 151.

[25] Dr. Smith explained the approach he took to his analysis in this case and indicated that, "like every business loss case," he needed information concerning "what the business was," "years," "acres . . . planted and the crops," the quantity of "crops yield per acre," the price per bushel, and the costs of harvesting, bagging, and handling; that "[c]onceptually to an economist we use the same principles"; and that the same economic principles apply whether it was for examining citrus trees in Costa Rica or horse farms in Wisconsin. Transcript Volume IV at 85. He stated he received much of the information "from some paperwork that you folks provided me" and that his economic research analyst gathered information from Robert. *Id.* When asked about the economic principles for "going from here into the future," or projecting loss into the future, he indicated that he assumed the prices would remain, on average, the same over time and stated that, while he could not tell the length of time to redevelop a seed crop, he could provide losses for each year into the future. *Id.* at 86. When asked if there were any other factors involved in future calculations, he testified:

> Not for future calculations, but the last seven. And I'll just tell you, everything I've talked about so far, it's pretty straightforward math. It's the kind of math you can do in high school. . . . [Y]ou know, a pound of wheat, 25 bucks a pound times 60 pounds . . . .

> The complicating factor, I think, is that once you make those projections in the future, you need to discount them to present cash value. . . .

*Id.* at 87. He stated he assumed "that those future dollars, that constant price per week in the future, except for inflation, that those future dollars are worth less today and a lot less," "[s]o we've used . . . a very significant business discount rate to look at the riskiness of small businesses," and that, applying his approach, he came to a conclusion about the loss for "2014, '15, '16, '17, and '18 through" the trial date. *Id.* at 87-88. Dr. Smith testified to the differences in his three reports and indicated the Second and Third Reports were identical and he changed the Third Report "to present evidence of 284 acres" instead of the 300 acres represented in the Second Report, which changed "literally, every number" "by 16 divided by 300, which is about 5 percent."[13] *Id.* at 94. He testified the Second and First Reports were the same except for a typographical error.[14] *Id.* The court admitted as an exhibit three tables from the Third Report

---

[13] Dated August 21, 2019, the Third Report states it was a revision to his "July 24, 2019 and March 13, 2017 reports" and it adjusted the calculation of damages "considering evidence to be presented at trial." Appellant's Appendix Volume II at 206. It states calculations "are performed using the same methodology of the loss of profits and calculation of present value which I have employed in my prior reports regarding Jones Farms." *Id.* It also indicates: "Based on Jones Farms expected production of 32,075 units of INW0412 wheat seed available for sale at a market price of $25.50 per unit, the expected gross revenues in 2014 are $817,912," "[f]or the 284 acres under cultivation for seed wheat, Mr. Jones reports that his 2014 costs were $428.86 per acre, for a total of $12,796," and "[f]or the expected gross revenues of $817,912 and non-incurred costs of $135,400, the loss for Jones Farms in 2014 is $682,512." *Id.* at 209-210.

[14] Dated July 23, 2019, the Second Report states it was an update to the March 13, 2017 report and explains:

> In my March 13, 2017 report I calculated the loss in 2014 to Jones Farms by subtracting the expenses not incurred following the destruction of the seed crop from the expected net income. However, loss to Jones Farms in 2014 should be based on gross income, and not the net

titled "Loss of Past Earnings 2014-2019," "Present Value of Future Earnings 2019-2038," and "Present Value of Net Earnings Loss 2014-2038." Exhibits Volume III at 157-159.

[26] On September 9, 2019, the court instructed the jury in its final instructions that Jones Farms had claimed certain defenses to Helena's claims, Jones Farms claimed that the "limitation of liability provision in the credit sales and services agreement is unenforceable," and Helena had claimed certain defenses to Jones Farms's counterclaims including that Jones Farms's damages were barred by the terms of the contracts between the parties. Transcript Volume IV at 124. The court instructed Jones Farms had to prove by the greater weight of the evidence that Helena's breach of contract caused damages which "the parties reasonably anticipated . . . when they entered into the contract." *Id.* at 126. The jury entered a verdict for Helena in the amount of $1,297,837 and a verdict for Jones Farms in the amount of $3,699,319, and the court entered judgment in favor of Jones Farms and against Helena in the amount of $2,401,482.

---

income. Jones Farms incurred expense of [sic] before the destruction of the INW0412 seed crop which would not be compensated if the loss is based on the net income.

Appellant's Appendix Volume II at 199. It indicates: "For the expected gross revenues of $912,008, and non-incurred costs of $150,560, the net loss for Jones Farms in 2014 is $761,448." *Id.* Regarding the inflation and business discount rates, the Second Report states it grew the annual net revenues at "the rate of inflation of 0.73 percent in 2015, 2.07 percent in 2016, 2.11 percent in 2017, 1.91 percent in 2018, and an estimated rate of inflation in 2019," the discount rate was determined using the method described in Duff & Phelps 2017 Valuation Handbook: The Guide to Cost of Capital, and that, assuming a long-term average growth rate of 2.0 percent for CPI growth, the "net discount rate is estimated at 17.71 percent." *Id.* at 199-200.

*Discussion*

I.

[27] The first issue is whether the trial court abused its discretion in admitting the testimony of Dr. Smith concerning damages and of Deford concerning the germination test results. The admission and exclusion of evidence falls within the sound discretion of the trial court, and this Court reviews those decisions only for an abuse of that discretion. *Brightpoint, Inc. v. Pedersen*, 930 N.E.2d 34, 38 (Ind. Ct. App. 2010) (citing *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002)), *trans. denied*. When we review for an abuse of discretion, we do not reweigh the evidence. *Id.* (citing *K.S. v. Marion Cty. Dep't of Child Servs.*, 917 N.E.2d 158, 162 (Ind. Ct. App. 2009)). We will reverse a trial court's decision to admit or exclude evidence only if that decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *State Farm Mut. Auto. Ins. Co. v. Woodgett*, 59 N.E.3d 1090, 1093 (Ind. Ct App. 2016)). Even if a trial court errs in a ruling on the admissibility of evidence, this Court will reverse only if the error is inconsistent with substantial justice. *Id.*

[28] Ind. Evidence Rule 702 provides:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

In adopting the rule, the Indiana Supreme Court did not intend to interpose an unnecessarily burdensome procedure for trial courts to apply when considering the admissibility of expert testimony. *Taylor v. State*, 101 N.E.3d 865, 870 (Ind. Ct. App. 2018) (citing *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 460 (Ind. 2001)), *reh'g denied*. "Rather, the rule was meant 'to liberalize, rather than to constrict, the admission of reliable scientific evidence.'" *Id.* (citing *Sears Roebuck & Co.*, 742 N.E.2d at 460). In *Taylor*, we observed that the "specialized knowledge" mentioned in Evidence Rule 702(a) includes more than just scientific knowledge, and if knowledge is not "scientific," it need not be proven reliable by means of "scientific principles" under Evidence Rule 702(b). *Id.* at 871 (citing *Lyons v. State*, 976 N.E.2d 137, 142 (Ind. Ct. App. 2012) (citing *Malinski v. State*, 794 N.E.2d 1071, 1084 (Ind. 2003))). "Rather, such evidence is governed only by the requirements of Rule 702(a), and any weaknesses or problems in the testimony go only to the weight of the testimony, not to its admissibility, and should be exposed through cross-examination and the presentation of contrary evidence." *Id.* (citing *Lyons*, 976 N.E.2d at 142 (citing *Turner v. State*, 953 N.E.2d 1039, 1050 (Ind. 2011))).

[29] Before turning to the merits of Helena's arguments, we note the issues it is not raising. It does not challenge the expertise of Dr. Smith, or his testimony or the other evidence concerning the loss of Jones Farms's past earnings or its present

value. Nor does it challenge Deford as being unqualified to have testified or lacking the knowledge, skill, experience and training that would allow him to have given opinion testimony on the topics of germination and germination testing and to assist the trier of fact to determine facts at issue.

A. *Dr. Smith*

[30] Helena argues it was prejudiced when Jones Farms subjected it to a "trial by ambush" and contends Dr. Smith modified his damages methodology a month prior to trial, Appellant's Brief at 18, and testified about an opinion disclosed six days prior to trial with modifications "made solely" to allow him to "testify around" the court's ruling on Helena's motion in limine. Appellant's Reply Brief at 4.

[31] The record reveals Jones Farms designated Dr. Smith's First Report on March 13, 2017, in opposition to Helena's motion for partial summary judgment, and the report valuing the loss of the INW0412 seed by calculating it as one would the loss of a business. On March 20, 2019, Helena deposed Dr. Smith. On July 23, 2019, it filed a motion in limine seeking to exclude damages testimony relating to alleged calculated damages, pointed to the First Report, and alleged Jones Farms's theory of damages hinged on presales. It filed a second motion alleging Dr. Smith's opinions were based on inadmissible evidence and not properly the subject of expert opinion, and attached excerpts of the deposition. After hearing argument, the court issued an order on August 8, 2019, which granted the first motion and precluded Jones Farms from using terms such as

"pre-sold" or "pre-ordered" without establishing the sale or order prior to loss. Appellant's Appendix Volume II at 177. The order denied the motion concerning Dr. Smith's testimony but clarified that the damages claim could include lost profits if Jones Farms presented "evidence sufficient to allow the jury to estimate the amount with a reasonable degree of certainty and exactness and not simply conjecture or speculation." *Id.* In August 2019, Helena filed its objection and motion to strike the Second and Third Reports. The court denied the motion to strike and noted it made a detailed review of the exhibits, disagreed that a new methodology was presented, and found ultimately that the same premium rate was reflected in both the Second and Third Reports. At trial in September 2019, Dr. Smith explained the approach taken in the reports and testified to the differences between them, and the court admitted three tables from the Third Report.

[32]    We note Helena does not challenge the particular methodology selected by Dr. Smith to discount Jones Farms's future damages, or specifically argue that the Third Report contains figures for yield per acre, price per unit, cultivation cost, and handling costs which differ than those used in the First and Second Reports. To the extent Helena argues the Third Report contained prohibited references or terms such as "pre-sold" or "pre-ordered," we note the report includes a determination of expected gross revenues in 2014 based on Jones Farms's "expected production" of INW0412 wheat seed "available for sale" at a given market price. *Id.* at 209. Needham testified regarding the market price and as to the reasonable range of sale prices in 2014 for good quality wheat seed and stated

that "anybody in the seed business would be able to sell their wheat for $25 to $30 per 50-pound unit." Transcript Volume II at 195. In light of the record, we do not find Helena's argument that it was prejudiced to be persuasive.

[33] Helena further argues the court erred in allowing Dr. Smith's testimony regarding future damages, which it alleges was unsupported by admissible evidence. It contends he did not produce or provide his own opinion or take into consideration whether Jones Farms had existing customers, historical sales, or contracts to sell the wheat seed. It argues he did not properly calculate the 2014 net profits by using a cost per acre figure which failed to include substantial costs.

[34] At the heart of its argument, Helena contends that Dr. Smith could never have reached the point of calculating the future damages without first relying on the values assigned by Robert. In contending that Dr. Smith did nothing more than repeat losses alleged by Robert, it relies on *Estate of Benefiel by and Through Benefiel v. Wright Hardware Co., Inc.*, in which this Court stated:

> As provided in Evidence Rule 703, "Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field."
>
>> Earlier Indiana cases, and other courts governed by Rule 703, generally have found the following sorts of information to be reasonably relied upon by experts in various fields: hospital records, laboratory reports, X-rays, and doctors' medical records relied on by medical professionals; reports by subordinates relied upon by superiors; discussions with other experts in the expert's field; mental hospital records reports by clinical psychologists and social workers, and police

reports relied upon by psychiatrists or forensic psychologists; a report from an engineering firm relied upon by an engineer; an autopsy report relied upon by a pathologist; business records relied upon by an expert in the business field; and state agency records relied upon by a law enforcement officer.

Courts have shown considerable reluctance to find reasonable reliance on information not prepared by persons with specialized training, such as lay witness statements, anonymous reports, statements by a party, and data prepared in anticipation of litigation.

*Schmidt v. State*, 816 N.E.2d 925, 938-39 (Ind. Ct. App. 2004) (quoting 13 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE, § 703.107, 427-30 (footnotes omitted)).

There are limits to this, however, to the extent that a party proffers opinion testimony that is merely "a conduit" for placing "physician's diagnoses into evidence without meaningful opportunities for cross-examination." *Faulkner v. Markkay of Indiana, Inc.*, 663 N.E.2d 798, 801 (Ind. Ct. App. 1996), *trans. denied*. As our supreme court has recognized,

Some experts customarily gather information from a variety of other experts and authoritative sources and rely upon it in reaching their opinions. When an expert witness's own independent opinion is arrived at in this manner and it is introduced into evidence and the expert witness is subject to cross-examination, that part of the substrata of information which aided in the formation of the opinion, though hearsay in nature and though not falling within any hearsay exception, may nevertheless be admissible for use by the trier of fact in judging the weight of the opinion.

*Barrix v. Jackson*, 973 N.E.2d 22, 26 (Ind. Ct. App. 2012) (quoting *Miller v. State*, 575 N.E.2d 272, 274 (Ind. 1991)), *trans. denied*. However, such hearsay is inadmissible where it is merely a restatement of another's conclusion "as a conclusory answer to an ultimate fact in issue," such that the veracity of the statement is not "subject to the test of cross-examination." *Id.* Accordingly, although an expert may rely on others' opinions as a basis for his opinion if other experts in the field reasonably rely on such opinions, the expert must bring his own expertise to bear in reaching his opinion and may not simply repeat opinions of others or announce that other experts concur with his opinion with respect to the case. *Duneland Props., LLC v. Northern Indiana Pub. Serv., Co.*, 14 N.E.3d 95, 105 (Ind. Ct. App. 2014).

128 N.E.3d 485, 490-491 (Ind. Ct. App. 2019), *reh'g denied*, *trans. denied*.

[35]     Here, Dr. Smith testified that, conceptually, economists use the same principles and apply them to examine dissimilar cases. He required, like in every business loss case, information concerning not only what the business was, but also the "years," "acres . . . planted and the crops," the quantity of "crops yield per acre," the price per bushel, and the costs of harvesting, bagging, and handling, which he received from paperwork provided to him and which his economic research analyst gathered from Robert. Transcript Volume IV at 85. *See also* Appellant's Appendix II at 207 (listing "Information Reviewed" in preparation for completing the Third Report). Importantly, he testified on how projections are made into the future using a business discount rate, which the Third Report also explains in its "Opinion" section. *See* Appellant's Appendix Volume II at 209-211. In light of Dr. Smith's testimony, the reports, and the methodologies used, we cannot agree that Dr. Smith had not brought his expertise to bear in

reaching an opinion. We conclude that the court did not abuse its discretion in admitting Dr. Smith's testimony.

B. *Joe Deford*

[36] Helena argues it was prejudiced by Deford's testimony when he was not disclosed as an expert witness and contends Jones Farms elicited expert testimony from him as to the manner in which the germination test was taken, the interpretation of the test results, and the impact of those results on the matters at issue, and that thus Jones Farms was required to disclose him as an expert. It explains it had no reason to treat him as an expert or "to inquire as to the opinions he might have outside the area of actual perception," and asserts that, "at a minimum," it would not have been surprised at trial by his testimony as to the importance of the never mentioned quality of "vigor." Appellant's Reply Brief at 13-14.

[37] The record reveals Jones Farms identified Joe Deford as a person believed to have knowledge relating to the litigation and as the Chief Operating Officer of ICIA who read the germination tests performed on the INW0412 treated and untreated seeds provided by Ag Alum in March 2017. At trial, during the testimony of Hulbert, the CEO of Ag Alum who initiated the germination tests and who also testified regarding the test results and the interpretation and impact of those results, Helena's counsel objected, and the court paused Hulbert's testimony upon request and allowed Deford to testify.

[38] Helena points to Deford's statement regarding the INW0412 test result percentages as "Much, much, much lower" to the standard norms for germination of good seed and his indications that a warm germination test offers optimum conditions, the ideal temperature for germination was different across species, that field emergence was generally less than test emergence, and that "vigor" was a measure of the robustness of an individual seed lot which was not tested by germination tests. Transcript Volume III at 140-141. We note the court granted the request of Helena's counsel to ask preliminary questions about the germination test results and overruled its objection, and Helena cross-examined Deford about the difficulties of seed growing in a field, potential lower germination levels, the test results for INW0412, and the test requirements of germination tests. Under these circumstances and in light of Hulbert's testimony, we cannot say that Helena was prejudiced by Deford's testimony.

[39] To the extent Helena argues Deford's testimony regarding the germination test did not meet the requirements of Ind. Evidence Rule 702 and asserts the test was flawed and did not meet Association of Official Soil Analysts (AOSA) standards, and Deford admitted as such and described the test as "reliable for what [Hulbert] wanted," Appellant's Brief at 27 (quoting Transcript Volume III at 139), this Court has provided that, in determining whether scientific evidence is reliable, the trial court must determine whether such evidence appears sufficiently valid or, in other words, trustworthy, to assist the trier of fact. *See Akey v. Parkview Hosp., Inc.*, 941 N.E.2d 540, 543 (Ind. Ct. App. 2011) (citing *Shafer &*

*Freeman Lakes Environmental Conservation Corp. v. Stichnoth*, 877 N.E.2d 475, 484 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*.  In so doing, the trial court

> must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue."  *Bennett* [*v. Richmond*, 960 N.E.2d 782, 791 (Ind. 2012)] (quoting *Shafer*[, 877 N.E.2d at 484]).  While there are relevant factors to consider, "there is no specific 'test' or set of 'prongs' which must be considered in order to satisfy Evid. R. 702(b)."  *Hannan v. Pest Control Servs., Inc.*, 734 N.E.2d 674, 680 (Ind. Ct. App. 2000), *trans. denied*.  In other words, application of Rule 702 is not mechanical and is within the trial court's discretion.

*McDaniel v. Robertson*, 83 N.E.3d 765, 773 (Ind. Ct. App. 2017).

[40]   After the court allowed Helena's counsel to establish foundation before addressing its objection, Deford indicated Hulbert had

> wanted to use the minimum amount of seed possible for testing.  And I told him that a normal seed test for germination would be 400 seeds.  He asked if we could test fewer seeds than that, and I said, well, it wouldn't be an official test at that point, but if all you wanted was to know something about the viability, we could do as little as 100 seeds.  And that's what we did.

Transcript Volume III at 136.  While Deford explained an official test was a statistical analysis "based on the number of seeds needed to get an inference of germination" and that 400 seeds would be appropriate statistically to make the inference, he also indicated he approached the INW0412 testing in the same fashion he had any other germination testing, he used the same procedures as

other tests, everything was "the same except the number of seeds that we tested," and the test results would be considered reliable and accurate. *Id.* at 137. In response to Helena's counsel's preliminary question of whether, based on his testimony of using 100 seeds, he still felt it was a reliable test, he answered:

> For what [Hulbert] wanted, I think that was a reliable finding. It wasn't an official test. But because of the amount of seeds, he didn't want them destroyed – is my understanding anyway, he didn't want to destroy that many . . . seeds, knowing that that's all the seed that exists, in his possession anyway. So we did what Jay asked, and that was to perform that 100-seed test just to give him an idea about what that lot might – you know, what level of viability it might have.

*Id.* at 139. Under these circumstances, we cannot say the trial court failed to make a preliminary assessment of whether the underlying methodology was scientifically valid and whether the methodology properly could be applied to the facts in issue. We find no abuse of discretion.

## II.

The next issue is whether the trial court erred in entering judgment for damages in the amount awarded by the jury in favor of Jones Farms. This Court has explained:

> We afford a jury's damage award great deference on appeal. *Sims v. Pappas*, 73 N.E.3d 700, 709 (Ind. 2017). In considering whether a jury verdict is excessive, we do not reweigh the evidence and look only to the evidence and reasonable inferences that may be drawn therefrom that support the verdict. *West v. J. Greg Allen Builder, Inc.*, 92 N.E.3d 634, 643 (Ind. Ct. App. 2017), *trans. denied*

(2018). If there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting, the award will not be disturbed. *Sandberg Trucking, Inc. v. Johnson*, 76 N.E.3d 178, 189 (Ind. Ct. App. 2017). . . . An award is not excessive unless the amount cannot be explained upon any basis other than prejudice, passion, partiality, corruption, or some other element of improper consideration. *Sims*, 73 N.E.3d at 709.

*Carney v. Patino*, 114 N.E.3d 20, 31 (Ind. Ct. App. 2018), *trans. denied*. "Appellate courts will not substitute their idea of a proper damage award for that of the jury." *Sears Roebuck and Co.*, 742 N.E.2d at 462 (quoting *Prange v. Martin*, 629 N.E.2d 915, 922 (Ind. Ct. App. 1994), *trans. denied*). "We will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground." *Id.* "We cannot invade the province of the jury to decide the facts and cannot reverse unless the verdict is clearly erroneous." *Id.* (quoting *Annee v. State*, 256 Ind. 686, 690, 271 N.E.2d 711, 713 (1971), *reh'g denied*).

[41] Helena argues the court erred when it allowed testimony as to Jones Farms's lost profits and that no evidence supports Jones Farms's claimed damages. Specifically, it points to exhibits of Jones Farms's sales and production reports used to determine royalty payments for years 2008 through 2014 and reports from submitted crop insurance applications showing production history for fields "on which Jones planted wheat [from] 1991 through 2016" and contends historical yield data demonstrates the actual yield of INW0412 never reached 101 bushels per acre. Appellant's Brief at 36. It also contends Jones Farms had no customers or contacts to which it would sell INW0412, no person or entity listed

by Robert "was actually an INW0412 customer," and the fair market value for the 2013-2014 wheat seed was considerably lower than $25.50 per unit. *Id.* at 30. It asserts that the grain elevator would be the only reliable market without any customers and thus that, when construing the evidence in Jones Farms's favor, the "2014 crop loss could not exceed $85,625," or "27,250 bu. * $4.50/bu" minus $37,000 of rental costs. *Id.* at 37-38.

[42] Consequential damages may include lost profits. *Berkel & Co. Contractors, Inc. v. Palm & Associates, Inc.*, 814 N.E.2d 649, 659 (Ind. Ct. App. 2004). If a party is seeking damages for lost profits, the award must be confined to lost net profits. *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1043 (Ind. Ct. App. 2012). An award of damages for lost profits is proper if the evidence is sufficient to allow the trier of fact to estimate the amount with a reasonable degree of certainty and exactness. *Id.* However, lost profits need not be proved with mathematical certainty. *Id.* Lost profits are not impermissibly uncertain where there is testimony that, while not sufficient to put the amount beyond doubt, is sufficient to enable the factfinder to make a fair and reasonable finding as to the proper damages. *Id.* Any doubts and uncertainties as to proof of the exact measure of damages must be resolved against the defendant. *Id.* It is wholly improper, however, for a trier of fact to project past profits indefinitely into the future without evidence that the projection was at least reasonably certain. *Id.* Also, an award of damages for lost profits cannot be based upon mere conjecture or speculation. *Id.*

[43]     The record reveals Robert's testimony about the various management techniques about which Jones Farms became educated and which it began to implement in anticipation of increasing seed yield, test weight, and other desirable qualities; that Jones Farms applied the management techniques to 284 acres of INW0412 in 2014 for the purpose of exceeding a hundred bushels an acre; and that he was reasonably confident that the 2014 crop would produce 101 bushels per acre. Needham testified about reasonable yields for a properly managed wheat seed crop in southern Indiana in 2014 and that "100 bushel wheat" is possible "most years" given intensive management and appropriate inputs. Transcript Volume II at 198. To the extent Helena points to reports determining royalty payments and showing production for wheat fields, we note Needham's cross-examination testimony that a farm could add ten or twenty bushels per acre of wheat just by improving management. The record further reveals INW0412, which was bred to be taller, had "met the need" in southern Indiana for a wheat with more straw. Transcript Volume III at 129. Jones Farms sold 1,107 units of INW0412 from 2011 to 2013. Robert indicated he had additional prospects for INW0412 in a customer list base, and Geswein testified Geswein Farms bought INW0412 wheat seed, its crop did well in 2014, he was pleased with the quality of the INW0412, and that he would have bought it in the future. Regarding wheat seed price, Geswein Farms purchased treated INW0412 wheat seed for $27.50 per unit, Jones Farms sold 1,107 units at a minimum of $21.00 each, and Needham testified, regarding the reasonable range of sale prices in 2014 for good quality wheat seed, that $25 to $30 per 50-pound unit would be the going price.

[44]     In addition, Dr. Smith explained his economic analyses and approach, and Jones Farms presented the calculations of the loss of past earnings from 2014 to 2019, the present value of future earnings from 2019 to 2038, and the present value of net earnings loss from 2014 to 2038. Based upon the record, and in light of our standard of review, we conclude the jury award to Jones Farms was adequately supported to a reasonable degree of certainty and fell within the scope of the evidence presented.

[45]     To the extent Helena argues the Credit Agreement limited Jones Farms's remedies to monetary damages not in excess of the purchase price, we note that Helena moved for summary judgment on this issue, that the trial court denied the motion and found "issues of material fact exist which impact whether the limitation of liability provision is applicable to Jones Farms's claims," and that the jury was instructed as to the Credit Agreement's limitation of liability provision, as well as that Jones Farms, on one hand, had claimed it was unenforceable and Helena, on the other hand, had claimed that it barred Jones Farms's damages. Appellant's Appendix Volume II at 43. Jones Farms argues that, under Tennessee law, a limitation of liability provision in a contract may be held unenforceable and cites a 2017 order from the United States District Court for the Western District of Tennessee which states a "clause in a contract may be substantively or procedurally unconscionable when the contract terms are unreasonably harsh or one party lacks meaningful choice during the bargaining process." *Beijing Fito Medical Company, Ltd. v. Wright Medical Technology, Inc.*, No. 2:15-cv-02258-JPM-TMP, 2017 WL 5170126, at *8 (W.D.

Tenn. 2017) (citing *Larry E. Parrish, P.C. v. Dodson*, Cause No. M2011-00349-COA-R3-CV (Tenn. Ct. App. Sept. 29, 2011)).

[46]     Tennessee Code § 47-2-719, titled "Contractual modification or limitation of remedy," provides:

> (1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages:
>
>> (a) the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and *may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price* or to repair and replacement of nonconforming goods or parts; and
>>
>> (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
>
> (2) *Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in chapters 1-9 of this title.*
>
> (3) Consequential damages may be limited or excluded *unless the limitation or exclusion is unconscionable.* Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

(emphasis added). The comments following the statute explain:

> 1. Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.

However, it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

* * * * *

3. Subsection (3) recognizes the validity of clauses limiting or excluding consequential damages but makes it clear that they may not operate in an unconscionable manner. Actually such terms are merely an allocation of unknown or undeterminable risks. The seller in all cases is free to disclaim warranties in the manner provided in Section 2-316.

Tenn. Code Ann. 47-2-719 cmts. 1, 3. Thus, Tennessee permits the limitation of remedies unless circumstances cause the remedy to fail of its essential purpose; specifically, commercial parties may limit or exclude consequential damages unless the limitation or exclusion is unconscionable. Even if the provision would survive an unconscionability review, we find that the Credit Agreement's limitation fails of its essential purpose. *See Baptist Memorial Hosp. v. Argo Const. Corp.*, 308 S.W.2d 337, 346 (Tenn. Ct. App. 2009) ("Failure of essential purpose as codified in Tennessee Code Annotated § 47-2-719 'is concerned with the

essential purpose of the remedy chosen by the parties, not with the essential purpose of the code or of contract law, or of justice and/or equity.'") (quoting *Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15, 28 (Tenn. Ct. App. 1993) (citing 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 12-10 (3d ed.), *reh'g denied*, *appeal denied*), *appeal denied*. That is, in the agricultural context, the refund of the price of the specific goods or services in this case is a "totally inadequate" remedy. *Nomo Agroindusrial SA DE CV v. Enza Zaden North Am.*, 492 F.Supp.2d 1175, 1181 (D. Ariz. 2007); *see also id.* (noting the "true value of the seeds only comes from the crop yielded," which is "preceded by considerable time and cost expended by the farmer," and finding the "lost growing season and the accompanying loss of profits" due to the defendant's defective seeds was not compensated by replacing or refunding the price of the seeds). Accordingly, we do not disturb the award on this basis.

[47] Additionally, Helena asserts that its own damages award was improper and contends Robert admitted in his testimony to owing over two million dollars, the Note provides for payment of interest and attorney's fees, the jury did not specify the amount of damages under the Credit Agreement, and that, given the jury award of $1,297,837 under the Note, "it stands to reason that the jury awarded at least $703,000 under the Credit Agreement" which was deducted under a theory of recoupment from the total judgment in Jones Farms's favor. Appellant's Brief at 41. It argues that alternatively, under an account stated theory, it is entitled to the full amount listed on its invoices and statements and

contends Jones Farms "never disputed the combined balance over $2.8 Million as of late 2015, when the Complaint was filed." *Id.* at 42.

[48] We note that Helena did not file a motion for judgment on the evidence or a motion to correct error. The Indiana Supreme Court has held that a claim of insufficiency of the evidence supporting a verdict "may not be initially raised on appeal in civil cases if not previously preserved in the trial court by either a motion for judgment on the evidence filed before judgment or in a motion to correct error." *Sims v. Pappas*, 73 N.E.3d at 709 n.6 (citing *Henri v. Curto*, 908 N.E.2d 196, 207-208 (Ind. 2009)). Even assuming that this issue is not waived, we do not find Helena's arguments require reversal. The jury was able to consider the loan statements and individual invoices for various products which Helena presented, as well as the testimony of Helena's director of credit, who indicated that $1,297,832.77 was the interest and principal due on June 10, 2014. The jury awarded $1,297,837 to Helena in damages, which we conclude was within the evidence presented. *See Sears Roebuck and Co.*, 742 N.E.2d at 462 ("Our inability to actually look into the minds of the jurors is, to a large extent, the reason behind the rule that we will not reverse if the award falls within the bounds of the evidence.") (quoting *Annee v. State*, 256 Ind. 686, 690, 271 N.E.2d 711, 713 (1971)). To the extent Helena argues an account stated theory applied and that Jones Farms did not dispute the amount owed prior to trial, we note that, before recovering on the theory of account stated, there must have been prior dealings between the parties, and after an examination of all the items by each of the parties, they must have "mutually agreed upon the items of the

account, and that the balance struck is just and due from the party against whom it is stated." *Jasper Corp. v. Manufacturers' Appraisal Co.*, 153 Ind. App. 457, 460, 287 N.E.2d 781, 782 (1972) (citing *Bosson v. Brash*, 63 Ind. App. 86, 114 N.E. 6, 7 (1916)), *reh'g denied*. Furthermore an account stated "arises only when each party to the transaction views the account as a final adjustment of the respective demands between them." *Brazier v. Maple Lane Apartments I, LLC*, 45 N.E.3d 442, 455 n.8 (Ind. App. Ct. 2015) (citing *MHC Surgical Ctr. Assocs., Inc. v. State Office of Medicaid Policy & Planning*, 699 N.E.2d 306, 310 (Ind. Ct. App. 1998)), *reh'g denied*, *trans. denied*. Based upon the record, we do not interfere with the jury award.

For the foregoing reasons, we affirm the trial court.

Affirmed.

Najam, J., and Kirsch, J., concur.